Jerry ANDERSON; Glenna Blair; Terry Davis; John Wardwell; Jesse Vasquez; Irene Jarez; Plaintiffs–Appellees–Cross–Appellants,

v.

COUNTY OF KERN; John Smith, Sheriff, Defendants–Appellants–Cross–Appellees.

Nos. 92–17040, 93–15019.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1994.*

Decided Jan. 13, 1995.

* The motion of the California Board of Corrections to file an amicus curiae brief is granted.

Richard A. Derevan and Deborah Fabricant, Snell & Wilmer, Irvine, CA, Richard P. Herman, Laguna Beach, CA, for plaintiffs-appellees-cross-appellants.

Holly N. Gallagher, B.C. Barman, County Counsel, Bakersfield, CA, John Hagar, Los Angeles, CA, for defendants-appellants-cross-appellees.

Thomas E. McConnell, Cal. Bd. of Corrections, Sacramento, CA, for amicus curiae Cal. Bd. of Corrections.

Before POOLE, CANBY and RYMER, Circuit Judges.

POOLE, Circuit Judge:

In this 42 U.S.C. § 1983 action, the district court entered a permanent injunction in favor of inmates at five Kern County jails. The inmates, who are pretrial detainees and convicted prisoners, appeal the district court's refusal to enjoin prison officials from placing mentally disturbed or suicidal prisoners in safety cells. The county defendants cross-appeal the district court's (1) injunction requiring prison officials to develop a policy regarding joint exercise and day room access for prisoners in administrative segregation, (2) injunction requiring prison officials to provide non-inmate translators for Spanish-speaking inmates seeking medical care, and (3) holding that their former dental and vision care policies were inadequate. We affirm in part and reverse in part.

I

Safety Cells

The inmates contend that the district court should have enjoined as unconstitutional Kern County's use of safety cells for suicidal and mentally disturbed inmates. Safety cells are padded cells that are used to temporarily confine violent or suicidal prisoners so they cannot hurt themselves.

The convicted inmates' challenge is evaluated under the Eighth Amendment, and the pretrial detainees' challenge is evaluated under the Fourteenth Amendment. *Redman v. County of San Diego*, 942 F.2d 1435, 1440 (9th Cir.) (en banc), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1991). Under the Eighth Amendment, the pertinent inquiry is (1) whether placement of mentally disturbed or suicidal inmates in safety cells constitutes an infliction of pain or a deprivation of the basic human needs, such as ade-

quate food, clothing, shelter, sanitation, and medical care, and (2) if so, whether prison officials acted with the requisite culpable intent such that the infliction of pain is "unnecessary and wanton." *Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). In prison conditions cases, prison officials act with the requisite culpable intent when they act with deliberate indifference to the inmates' suffering. *Id.; Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991); *Jordan v. Gardner,* 986 F.2d 1521, 1528 (9th Cir.1993) (en banc). Similarly, the placement of pretrial detainees in safety cells is "punishment" in violation of the Fourteenth Amendment only if prison officials act with deliberate indifference to the inmates' needs. *Redman,* 942 F.2d at 1441–43; *Hallstrom v. Garden City,* 991 F.2d 1473, 1485 (9th Cir.) (applying *Redman* to conditions of confinement claim), *cert. denied,* — U.S. —, 114 S.Ct. 549, 126 L.Ed.2d 450 (1993).

The test for whether a prison official acts with deliberate indifference is a subjective one: the official must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* — U.S. at —, 114 S.Ct. at 1979.

The parties proffered the following evidence.

Kern County currently has one safety cell in use.[1] It is approximately 10 feet by 10 feet, is covered with a rubberized foam padding, and has a pit toilet with a grate. If inmates are in the cell at mealtime, they eat their meals there.

Sergeant Bradley, a supervisor, estimated that 40% of the prisoners placed into the safety cell were suicidal. Inmates that are placed on suicide watch in the cell are given paper clothing so that they cannot hang themselves with their regular clothing. Sometimes the inmates destroy this paper clothing and thus are naked or clad only in their underwear. According to Sergeant Bradley, inmates placed in the safety cell are always given at least paper clothing and are not put naked into the cell. One inmate testified that she was placed naked into the cell because she threatened to choke herself with the paper clothing.

If inmates are violent, they may be shackled to the grate over the pit toilet. According to one nurse, chaining did not happen frequently. According to Sergeant Bradley, during the period July 1987 to January 1991 he observed approximately ten instances of an inmate shackled with handcuffs attached to a waist chain, leg irons separated with a 12-inch chain, and secondary chains attached from the leg irons to the toilet grate. A supervising nurse testified that sometimes "the kindest thing to do was to restrain [certain inmates] . . . to prevent them from hurting themselves. . . . I've seen inmates bang their heads on the wall [and] . . . on the grate in the safety cell since that was the only metal part in there."

Inmates and prison officials testified about three inmates' experiences in the safety cell. One inmate was placed in the safety cell on several occasions, once after he tried to kill himself and twice after he became violent. On the occasion he tried to kill himself, he was shackled all night to the toilet grate with leather restraints and was given only a paper shirt that prison officials placed over his lap. Another inmate, who was placed in the cell for about three hours after she threatened suicide, was shackled to the grate. A third inmate testified that after he told a deputy that he was thinking about hurting himself, he was placed without restraints into the safety cell for about an hour and a half, which made him feel "awful", "depressed", "claustrophobic", and "degraded." The inmates testified that the cell was dark, scary, and smelled bad, and that the pit toilet was encrusted with excrement and urine.

Dr. Rundle, the plaintiffs' expert witness, testified that the cell was small, dark, dingy, and scary. He also testified that these conditions would be psychologically damaging to anyone and would be particularly damaging to mentally disturbed and suicidal inmates left alone in the cell. He opined that it was

---

1. It had a second, virtually identical, cell in use at the time of the trial.

inappropriate to secure any prisoner to the toilet grate, but he later testified that it would not be inappropriate to restrain violent prisoners in this manner.

A prison administrator from King County, Washington testified that most prisons attach a device to the wall for shackling in lieu of shackling prisoners to the toilet grate. A former administrator with the Federal Bureau of Prisons testified that safety cells in federal prison have a bed, a stainless steel commode, and a wash basin.

Evidence was presented regarding the monitoring of the safety cell. California Code of Regulations title 15, section 1055 provides that an inmate

> shall be placed in a safety cell only with the approval of the facility manager or the watch commander and continued retention in such a cell shall be reviewed a minimum of every eight hours. A medical/mental health opinion on placement and retentions shall be secured within 24 hours of placement in such a cell or at the next daily sick call, whichever is earliest, and the inmate shall be medically cleared for continued retention every 24 hours thereafter. Intermittent direct visual supervision shall be provided every half hour.

In addition to section 1055's procedures, nursing staff does a screening within 30 minutes after an inmate is placed in the cell, the inmate is checked visually every 15 to 30 minutes, and the shift supervisor reviews the safety cell placement every 4 hours.

On the basis of this evidence, the district court rejected the inmates' challenge to the use of safety cells, finding that nothing suggested that "the safety cells had been inappropriately used as more than a temporary measure to control violent inmates until they 'cooled down' sufficiently to be released from those cells. The experts ... agreed that the cells could appropriately be used for this purpose." The district court also held that the plaintiffs failed to show that Kern County had an inadequate program for identifying, treating, and supervising suicidal inmates.[2]

We affirm the district court's holding. The safety cell is admittedly a very severe environment, but it is employed in response to very severe safety concerns. There was ample testimony that some prisoners became so violent and such a danger to themselves that temporary placement in a safety cell was needed in order to deprive the prisoners of all means of harming themselves. The fact that some prisoners who are violent or threaten violence to themselves or others may be mentally disturbed or suicidal does not detract from the need. There was testimony that sinks, stand-up toilets, and beds can be and have been used by prisoners to harm themselves by banging against them or by other means. Deprivation of these articles for short periods of time during violent episodes is constitutionally justifiable. There was sufficient evidence to support the district court's factual finding that the safety cell was used to control violent inmates, and that the inmates were confined to the safety cell only for short periods of time. *See Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir.1982) (in evaluating challenges to conditions of confinement, court may consider the length of time the prisoners must go without basic human needs). The district court therefore did not err in refusing to enjoin the County from ever making use of a safety cell for mentally disturbed or suicidal prisoners.

There was testimony from some plaintiffs that the cell was dirty and smelled bad. Unquestionably, subjection of a prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment. *See, e.g., Gee v. Estes*, 829 F.2d 1005, 1006 (10th Cir.1987) (Eighth Amendment claim established by allegations that prisoner was placed naked in a lice-infested cell with no blankets in below forty-degree temperatures, denied food or served dirty food, and left with his head in excrement while having a seizure); *McCray v. Burrell*, 516 F.2d 357, 366–69 (4th Cir.1974) (prisoner placed naked in bare, concrete, "mental observation" cell with excrement-encrusted pit toilet for 48

---

**2.** Although the plaintiffs challenged the adequacy of the mental health care program generally in the district court, they specifically did not appeal this issue but argue only that the use of safety cells for mentally ill and suicidal prisoners is unconstitutional.

hours after he allegedly set fire to his cell; prisoner had no bedding, sink, washing facilities, or personal hygiene items, and he was not seen by a doctor until after he was released), *cert. denied,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *Gates v. Collier,* 501 F.2d 1291, 1302 (5th Cir.1974) (punishment of prisoner by confinement in small, dirty cell without light, hygienic materials, adequate food, heat; prisoner also was punished through administration of milk of magnesia); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (prisoner confined for five days in strip cell with only a pit toilet and without light, a sink, or other washing facilities), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

■ The plaintiffs here have not shown, however, that the sanitary limitations imposed upon them were more than temporary. More important, they have not shown why possible sanitation problems required that the County be enjoined permanently from *ever* making *any* use, however temporary, of a safety cell for mentally disturbed or suicidal prisoners. That a safety cell needs more frequent cleaning, or that its toilet needs more frequent flushing, does not establish that the cell must never be used at all.

■ In addition to their failure to establish that temporary imposition of the conditions of the cell constituted an "infliction of pain" in violation of the first part of the *Farmer* test, the plaintiffs also have not satisfied the second part of the test: prison officials' deliberate indifference to the inmates' suffering. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1977. Prison officials have to have some means of controlling violent or self-destructive inmates temporarily until the episode passes, and as the plaintiffs' own expert testified, it is difficult to distinguish between violent, mentally healthy inmates and violent, mentally disturbed ones. Similarly, in an emergency, prison officials are not culpable when they put an inmate who imminently threatens or attempts suicide temporarily in a place where he cannot hurt himself. In light of the safety concerns underlying use of the safety cell, the plaintiffs' evidence is not sufficient to compel an inference that the defendants are "knowingly and

unreasonably disregarding an objectively intolerable risk of harm" and will continue to do so in the future. *Id.* at ——, 114 S.Ct. at 1983. The plaintiffs accordingly have failed to establish the subjective as well as the objective components of an Eighth Amendment prison conditions claim for injunctive relief. *See id.* We therefore affirm the district court's refusal to enjoin the use of the safety cell.

## II

### Joint Exercise for Inmates in Administrative Segregation

The defendants contend that the district court erred by ordering them to develop a policy allowing prison officials to exercise discretion to determine whether certain prisoners housed in administrative segregation can safely exercise or have dayroom access together.

■ "[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Thus, the hardship associated with administrative segregation, such as loss of recreational and rehabilitative programs or confinement to one's cell for a lengthy period of time, does not violate the due process clause because there is no liberty interest in remaining in the general population. *Toussaint v. McCarthy,* 801 F.2d 1080, 1091–92 (9th Cir.1986) (applying *Hewitt v. Helms*), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

Kern County has various classes of prisoners in administrative segregation, including inmates (such as former police officers, former correctional officers, and persons accused of notorious crimes) who might be subject to attack by other inmates, other protective custody inmates, security risk inmates, combined protective custody-security risk inmates, and general population inmates who require temporary administrative segregation. A prison official testified that administrative segregation was a last resort for

people who either, for their own safety or safety of other inmates, cannot be around one other person without direct absolute control of their movement and behavior. And that even means being out in the dayroom with other folks, even one other person. The potential could be there that they can either be harmed or they're going to harm someone else.

Inmates in administrative segregation retain all inmate privileges such as family visits, telephone access, and exercise. They are all single-celled, however, and have no contact with any other inmate, either for exercise, day room access, or otherwise. The inmates presented some evidence that isolation has adverse effect upon the inmates.

Here, the inmates contend that a policy that does not give prison officials discretion to allow certain ad seg inmates to exercise or use the day room together constitutes deliberate indifference to the inmates' needs. This contention fails.

■ First, as this court held in *Toussaint*, administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence. 801 F.2d at 1091–92.

■ Second, prison officials have a legitimate penological interest in administrative segregation, and they must be given "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *see Turner v. Safley,* 482 U.S. 78, 87–91, 107 S.Ct. 2254, 2260–63, 96 L.Ed.2d 64 (1987); *Michenfelder v. Sumner,* 860 F.2d 328, 331 & n. 1 (9th Cir.1988) (*Turner*) factors may be instructive in contexts other than the First Amendment).

■ Confinement in a cell for most of the day is not pleasant. And the relief ordered by the district court was extremely reasonable and deferential to prison officials. These factors make it somewhat difficult to reverse the district court's injunction. But the confinement at issue here does not rise to the level of deliberate indifference. As this court observed in *Wright v. Rushen,* "[c]ourts must diligently ensure compliance with constitutional requirements and with statutes designed to improve prison conditions. But courts may not institute reform programs on their own under the guise of correcting cruel and unusual punishment." 642 F.2d 1129, 1135 (9th Cir.1981).

Accordingly, we hold that the district court erred by finding a constitutional violation and by ordering injunctive relief.

### III

### Non–Inmate Translators for Medical Interviews

The defendants contend that the district court erred by ordering them to provide a Kern County employee, preferably a member of the medical staff, to translate for Spanish-speaking inmates who request a translator during medical and mental health interviews.

■ Jail officials violate a prisoner's Eighth Amendment rights if they are deliberately indifferent to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986) (same standard applies to pretrial detainees). The indifference to medical needs must be substantial; a constitutional violation is not established by negligence or "an inadvertent failure to provide adequate medical care." *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292.

The Ninth Circuit has not ruled on the issue of whether failure to provide translators can constitute deliberate indifference. The Seventh Circuit has held that it can:

An impenetrable language barrier between doctor and patient can readily lead to misdiagnoses and therefore pain and suffering. This type of language problem which is uncorrected over a long period of time and as to which there is no prospect of alleviation, can contribute to unconstitutional deficiencies in medical care.

*Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).

■ Here, the district court ordered only that a non-inmate translator, preferably a member of the medical staff, be made available upon an inmate's request. This is consistent with the jail's existing written policy that a medical staff member will translate, and, if a medical staff member is not available, a member of the correctional staff will translate. Inmate translators can still be used unless an inmate requests a staff member. The testimony was undisputed that inmate translation was inappropriate and potentially inaccurate, and even the nursing supervisor admitted she preferred non-inmate translators. Finally, there are nine members of the jail staff who are fluent in Spanish, and seven more speak some Spanish. The district court did not abuse its discretion. *See LeMaire v. Maass,* 12 F.3d 1444, 1451 (9th Cir.1993) (a district court has broad discretion to fashion remedies once a constitutional violation is found).

## IV

### Dental and Vision Care

The defendants contend that the district court erred by holding that the jail's former dental and vision care policies were constitutionally inadequate. The plaintiffs argue persuasively that the defendants have no standing to raise this issue because the district court did not grant injunctive relief. *See Native Village of Tyonek v. Puckett,* 957 F.2d 631, 633 (9th Cir.1992). The district court did not grant injunctive relief to the plaintiffs because the defendants changed their policies during the litigation, thereby mooting the plaintiffs' claims.[3]

■ The defendants nevertheless argue that the panel should consider the issue because it affects the attorneys' fees that the plaintiffs may recover. The issue is an interesting one: if the defendants revised their policy in response to the plaintiffs' civil rights action, thus mooting the plaintiffs' claim, are the plaintiffs nonetheless prevailing parties entitled to recover fees under 42 U.S.C.

§ 1988? However interesting the issue, it is not ripe. It should be considered by the district court in the ancillary proceedings regarding attorneys' fees.

**AFFIRMED in part and REVERSED AND REMANDED in part.**

---

3. The defendants advised the district court that they revised the policies in their post-trial brief.