David L. MAY, Plaintiff,

v.

G.H. BALDWIN, Superintendent, Eastern
Oregon Correctional Institution; et
al., Defendants.

Civ. No. 94–664–JO.

United States District Court,
D. Oregon.

Aug. 7, 1995.

David L. May, Eastern Oregon Correctional Institution, Pendleton, OR, pro se.

Jan Peter Londahl, Department of Justice, Administration, Salem, OR, for defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

▇ Plaintiff, an inmate at the Eastern Oregon Correctional Institution (EOCI), brings this civil rights action pursuant to 42 U.S.C. § 1983 (1988) seeking damages and equitable relief.[1] In his second amended complaint[2] plaintiff alleges, in part, that prison officials offended his First Amendment rights by ordering him to undo his dreadlocks in violation of his Rastafarian religious beliefs. He also contends that prison officials inflicted cruel and unusual punishment when they placed him in the Disciplinary Segregation Unit (DSU) at EOCI and subsequently placed him on "loss of privileges" status.[3]

Defendants move for summary judgment (# 44) against plaintiff's complaint because they allegedly have qualified immunity. For the reasons set forth below, defendants' motion for summary judgment is GRANTED.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly

1. In addition, plaintiff claims that defendants' actions also violate provisions of the Oregon Constitution. (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 7–8.) It is well settled, however, that "only violations of the federal constitution or federal law are cognizable under 42 U.S.C. § 1983, not state law violations." *Canell v. Oregon Dept. of Justice,* 811 F.Supp. 546, 550 (D.Or.1993) (citing *Williams v. Treen,* 671 F.2d 892, 900 (5th Cir.1982), *cert. denied,* 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983)). The appropriate remedy for violations of the Oregon Constitution by public officials is the Oregon Tort Claims Act, O.R.S. 30.260–30.300 (1993).

2. Upon granting plaintiff *in forma pauperis* status this court dismissed plaintiff's first complaint as frivolous. Plaintiff then filed an amended complaint which was dismissed because the form was improper and plaintiff had improperly named the Oregon Department of Corrections as a defendant.

3. Inmates on loss of privileges must remain in their assigned cell/bunk area except for meals, call-outs, work assignments, assigned educational training classes, and visits. (Defendants' Exh. 101 ¶ 27.)

probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Serv.,* 809 F.2d at 631. Inferences drawn from the facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## BACKGROUND

Plaintiff was to be transported from EOCI on March 24, 1994 for a medical examination. As part of the search process conducted on inmates before transport from EOCI, prison officials ordered plaintiff to unbraid his dreadlock-style hair. Plaintiff refused and was subsequently placed in the DSU for seven days pending a disciplinary hearing. (Defendants' Exh. 101 ¶ 11.) After the disciplinary hearing, plaintiff was sanctioned a total of 21 days loss of privileges status upon release from the DSU on March 30, 1994. (Defendants' Exh. 101, Attach. 4.) Following a second disciplinary hearing on April 25, 1995, he was further sanctioned to five days in the DSU without recreation yard privileges followed by seven days loss of privileges status for failure to comply with the order to unbraid his hair. (Defendants' Exh. 101, Attach. 7.)

On May 17, 1994, plaintiff was once again scheduled to be transported from EOCI. On this occasion, plaintiff again refused to unbraid his hair despite being asked by prison officials to do so one day earlier. (Defendants' Exh. 101 ¶ 12.) Consequently, prison officials held a third disciplinary hearing where plaintiff received the following sanctions for disregarding the order: (1) seven days in the DSU, (2) loss of recreation yard privileges while in the DSU, (3) 14 days loss of privileges status upon release from the DSU, and (4) a $25.00 fine. (Defendants' Exh. 101 Attach. 5.)

## DISCUSSION

This court is mindful of the notion that federal courts should be reluctant to interfere with the operation and discipline of a state prison, and will only do so "upon a clear showing of a violation of a federally guaranteed constitutional right." *Holt v. Sarver,* 442 F.2d 304, 307 (8th Cir.1971). In *Gates v. Rowland,* 39 F.3d 1439 (9th Cir.1994), the Ninth Circuit elaborated upon this principle of judicial restraint:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the provinces of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Id.* at 1448 (quoting *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)). In addition, in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court noted that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878.

To state a claim under section 1983, a plaintiff must allege (1) the violation of a Constitutional right and (2) must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254, 101 L.Ed.2d 40 (1988); *L.W. v. Grubbs,* 974 F.2d 119, 120 (9th Cir.1992).

Government officials performing discretionary functions are protected from liability for civil damages so long as their conduct does not violate clearly established constitutional rights of which a reasonable

person would have known.[4] *Elder v. Holloway*, — U.S. —, —, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The plaintiff bears the burden of demonstrating that the constitutional right allegedly violated was "clearly established" at the time of the conduct at issue. *Maraziti v. First Interstate Bank of California*, 953 F.2d 520, 523 (9th Cir.1992); *Romero v. Kitsap*, 931 F.2d 624, 627 (9th Cir.1991). Whether the law governing the conduct is "clearly established" is a pure question of law. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993).

■ Thus, when presented with a motion for summary judgment based on qualified immunity, the court must engage in a three part analysis: (1) the identification of a specific right allegedly violated; (2) the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) whether a reasonable officer could have believed lawful the particular conduct at issue. *Romero*, 931 F.2d at 627. If the right was not "clearly established" or the officer could

have reasonably believed that his conduct was lawful, the officer should prevail. *Id.* at 627.

## I. First Amendment

### A. Dreadlocks

■ Plaintiff alleges that his First Amendment right to free exercise of religion was violated when prison officials, pursuant to state prison regulations,[5] ordered him to undo his dreadlocks in violation of his Rastafarian religious beliefs. (Second Amended Complaint ¶ 25.) The Ninth Circuit recently held that prisoners' free exercise of religion claims are to be analyzed under the Religious Freedom Restoration Act ("the Act"), 42 U.S.C. §§ 2000bb—2000bb–4; *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995); *see also Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.1995) (holding that the Act is the analytical framework governing *all* free exercise of religion claims, including those of prisoners). The Act, passed by Congress in 1993, provides that government shall not substantially burden an individual's exercise of religion. 42 U.S.C. § 2000bb–1(a). However, the Act also states that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that the application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and

ing or exiting the Disciplinary Segregation Unit and/or before or after contact with persons outside the facility."

In addition, O.A.R. 291–123–015(2)(b) states that "[i]f a hair search needs to be conducted by staff, it may be necessary to require that the inmate unbraid or loosen the hair to complete the search."

As noted above, plaintiff refused to comply with these regulations when, on two separate occasions, he was scheduled to be temporarily transported from EOCI.

Plaintiff argues that O.A.R. 291–123–015(2)(b) does not apply to his situation because it does not specifically mention the word "dreadlocks." (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 8–9.) I find no merit to this argument. The phrase "it may be necessary to require that the inmate ... loosen the hair ..." applies to all styles of hair including dreadlocks. O.A.R. 291–123–015(2)(b).

---

**4.** Qualified immunity does not affect claims for injunctive or declaratory relief. *Malik v. Brown*, 16 F.3d 330, 335 n. 4 (9th Cir.1994). A plaintiff, however, is not entitled to equitable relief if there is no "very significant possibility" that his constitutional rights will be infringed in the future. *Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir.1990).

Because, as noted below, plaintiff fails to allege any facts demonstrating that his clearly established constitutional rights have been violated, there is also no genuine issue of fact as to whether there is a "very significant possibility" that his constitutional rights will be violated in the future. Thus, summary judgment with respect to plaintiff's claims for equitable relief is also appropriate.

**5.** Oregon Administrative Rule 291–41–015(4) provides that "all inmates will be subject to a search on each occasion before and after they leave a Department of Corrections facility, and on each occasion before and/or after visits, enter-

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b).

■ Defendants do not dispute that requiring plaintiff to undo his dreadlocks substantially burdens his right to exercise his Rastafarian religious beliefs. (*See* May Religion Aff.; Second Amended Complaint ¶ 25.) Therefore, the issue before this court is whether EOCI's grooming policy is in furtherance of a compelling governmental interest and, if so, whether it is the least restrictive means of furthering that interest.

I find that EOCI's requirement that inmates leaving or returning to the facility loosen their hair does serve a compelling governmental interest: maintaining prison security by preventing the introduction of contraband into the facility. *See Turner,* 482 U.S. at 91, 107 S.Ct. at 2263 (prison security is a valid penological interest); *Wolfish,* 441 U.S. at 545, 99 S.Ct. at 1877 (maintaining prison security is an essential goal that may require limitation of prisoners' retained constitutional rights); *Witherow v. Paff,* 52 F.3d 264, 265 (9th Cir.1995) ("[l]egitimate penological interests include security, order, and rehabilitation"); *Hall v. Bellmon,* 935 F.2d 1106, 1114 (10th Cir.1991) (prison intake facility's policy of cutting inmates' hair does not violate free exercise of religion as it is related to legitimate penological interests: preventing inmates from hiding weapons in their hair); *Rickman v. Avaniti,* 854 F.2d 327, 328 (9th Cir.1988) (noting that maintaining prison safety and preventing the introduction of contraband into a prison are important objectives of penal institutions); *Martinelli v. Dugger,* 817 F.2d 1499, 1506 (11th Cir.1987) (maintaining prison security is a substantial governmental interest). Without this requirement, inmates would have the opportunity to use their braids to conceal contraband, escape devices, weapons, or drugs, (Defendants' Exh. 102 ¶¶ 8, 9), as exemplified on at least one occasion when Oregon Department of Corrections authorities discovered contraband hidden in an inmate's afro-style hair. (Defendants' Exh. 102 ¶ 18; Attach. 3). Therefore, defendants have shown that permitting plaintiff to avoid undoing his dreadlocks potentially threatens institutional security. Moreover, plaintiff has failed to allege any facts suggesting that the requirement that inmates undo their braids does not serve the prison's legitimate security concerns.

In addition, I find that EOCI's requirement that inmates leaving or returning to the facility loosen their hair is the least restrictive means of furthering the prison's valid security interests. There is no evidence in the record of an alternative policy that would have a less burdensome affect on plaintiff's religious beliefs while also accommodating the prison's compelling interest in preventing the introduction of contraband into the facility. Thus, even under the Act's stringent "compelling interest" test, plaintiff's claim fails because EOCI's grooming policy advances a compelling governmental interest, prison security, and it is the least restrictive means of furthering that interest.

■ Plaintiff has also failed to offer any evidence that it was clearly established that the First Amendment precluded prison officials from requiring him to undo his dreadlocks. Rather, case law clearly establishes that prison officials may freely regulate the style and length of inmates' hair without offending their First Amendment right to free exercise of religion. *E.g., Scott v. Mississippi Dept. of Corrections,* 961 F.2d 77, 80 (5th Cir.1992) (prison hair-grooming regulation does not violate Rastafarian's First Amendment right to free exercise of religion); *Iron Eyes v. Henry,* 907 F.2d 810 (8th Cir.1990) (prison hair-grooming regulation does not violate Native American's right to free exercise of religion); *Friedman v. State of Arizona,* 912 F.2d 328, 331 (9th Cir.1990) (prison regulation prohibiting facial hair does not violate inmate's right to freely exercise his Orthodox Jewish faith); *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989) (same); *Martinelli,* 817 F.2d at 1506–07 (prison hair length regulations do not violate prisoner's right to freely exercise his personal religious faith); *Wilson,* 761 F.2d at 924–28 (prison hair-grooming regulation does not violate Rastafarian's right to free exercise of religion). Therefore, plaintiff's alleged right to

be free from undoing his dreadlocks was not a clearly established constitutional right.

In conclusion, plaintiff's free exercise of religion claim fails as a matter of law for two reasons: (1) because EOCI's regulation requiring inmates to unbraid their hair prior to leaving and upon returning to the facility serves a compelling governmental interest, prison security, and it is the least restrictive means of furthering that interest; and (2) because plaintiff's alleged right not to undo his dreadlocks is not a clearly established constitutional right.

### B. Access to Library

▮ Plaintiff claims that his First Amendment rights were violated when he was denied access to the prison library facility while on twenty-one days loss of privileges status.[6] (Second Amended Complaint ¶ 33.) However, plaintiff fails to cite any case law clearly establishing a prisoner's constitutional right to general library privileges. Accordingly, summary judgment is appropriate. *See Wheeler v. Sims,* 951 F.2d 796, 804 (7th Cir.1992) (holding that arguments unsupported by legal reasoning or case law are waived).

▮ Plaintiff also complains that the denial of access to the library was cruel and unusual punishment. (Second Amended Complaint ¶ 32.) Contrary to plaintiff's allegations, it is not a violation of the Eighth Amendment to deny a prisoner access to a prison library. *See Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982) ("an institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, shelter, sanitation,

medical care, and personal safety." (internal quotations omitted)). Thus, defendants did not violate a clearly established constitutional right by denying plaintiff access to the prison library.

### II. Fourth Amendment—Strip Search

▮ Plaintiff argues that transport officers at EOCI violated his Fourth Amendment right against unreasonable searches when they did not attempt to search his hair after he refused to undo his dreadlocks prior to transport from the facility. (Second Amended Complaint ¶ 29.) According to plaintiff, "if the search would have been conducted, it would not have been conducted in a reasonable manner because of the envasion [sic] of personal rights against having to spread his buttocks and lift and separate his genitals." (*Id.*) In short, plaintiff does not assert that he was actually the subject of an unconstitutional search; he merely hypothesizes that, had a search been conducted by transport officers, it would have been unreasonable.[7] Because no search was conducted, plaintiff lacks standing to assert a Fourth Amendment violation.[8] Accordingly, summary judgment is warranted.

### III. Eighth Amendment—Conditions of Confinement

▮ The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney,* —— U.S. ——, ——, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). Analysis of an Eighth Amendment claim includes (1) an objective compo-

---

**6.** Plaintiff's claim is not a claim of denial of law library privileges. It is a First Amendment claim based on denial of access to the general prison library. (Second Amended Complaint ¶ 33.)

**7.** Although the pleadings are not entirely clear, plaintiff apparently does not challenge the constitutionality of the visual strip searches which were actually conducted by prison officials each time plaintiff left his cell while in the DSU. (Defendant's Exh. 101 ¶¶ 15–16; Defendants' Exh. 103 ¶ 2; Defendants' Exh. 104 ¶ 2.) Nonetheless, it is not a violation of the Fourth Amendment for prison officials to require that inmates in an administrative segregation unit submit to visual strip and body cavity searches when leav-

ing their cells. *Rickman,* 854 F.2d at 328. Thus, even if plaintiff does challenge these searches, summary judgment is appropriate.

**8.** To establish standing under the case or controversy requirement of Article III of the Constitution, a plaintiff must show that his alleged injury is "both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (internal quotations omitted); *see also Darring v. Kincheloe,* 783 F.2d 874, 876–77 (9th Cir.1986) (holding that in order for a prisoner to have standing to challenge the constitutionality of an institutional order, the prisoner must show (1) injury in fact, and (2) causality).

nent, whether the alleged misconduct was harmful enough to establish a constitutional violation; and (2) a subjective component, whether the official acted with a sufficiently culpable state of mind. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991); *LeMaire v. Maass,* 12 F.3d 1444, 1451 (9th Cir.1993). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324).

## A. Exercise

■ Plaintiff alleges his Eighth Amendment rights were violated because he was denied the required "minimal opportunities for exercise" when he was placed in the DSU for seven days on loss of recreation yard privileges and subsequently placed on seven days loss of privileges status in the general prison population. (Second Amended Complaint ¶¶ 31, 35.) "Exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment." *LeMaire,* 12 F.3d at 1457. Furthermore, the Ninth Circuit has held that denial of outdoor exercise "for a period of years" is unconstitutional. *Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir.1979).

Inmates in the DSU at EOCI are given an opportunity to exercise a minimum of twenty minutes per day, five days per week. (Defendants' Exh. 101, Attach. 6 at 9–10.) Inmates in the DSU and on loss of recreation yard privileges are not permitted to use the recreation yard. (Defendants' Exh. 106 ¶ 3.) These inmates, however, are given a ten minute shower period three days per week and may exercise in their cells. (*Id.* ¶ 4.) Inmates on loss of privileges status remain in the general prison population but they are not allowed to use the recreation yard. (De-

fendants' Exh. 101, Attach. 5 at 9.) However, inmates on loss of privileges status are permitted to exercise in their cells. (Defendants' Exh. 101 ¶ 28.)

In *LeMaire,* the Ninth Circuit held that the Oregon Department of Corrections' DSU exercise policy did not violate the Eighth Amendment. *LeMaire,* 12 F.3d at 1458. The court stated that "DSU inmates free of infractions for forty-five days have abundant exercise privileges available to them in the DSU. This includes exercise privileges outside of their cells and out-of-doors five days a week." *Id.* at 1458. The court also noted that by denying an inmate recreation yard privileges while he was in the DSU, prison officials did not violate his constitutional rights because he could still exercise in his cell. *Id.*

In the present case, plaintiff offers no evidence that he was denied a reasonable opportunity to exercise in his cell or that he was denied the opportunity to walk from his cell three days per week for a ten minute shower period while in the DSU. He also offers no evidence that prison officials prevented him from exercising in his cell while on loss of privileges status. Furthermore, plaintiff was only deprived of outdoor exercise continuously for a period of, at most, four weeks which does not give rise to a legitimate Eighth Amendment claim.[9] *See, e.g., Harris v. Fleming,* 839 F.2d 1232, 1236 (7th Cir.1988) (holding that denial of out-of-cell exercise for four weeks is not unconstitutional); *Toussaint v. Yockey,* 722 F.2d 1490, 1492–93 (9th Cir.1984) (holding that denying exercise to inmates in segregation for more than one year raises a substantial constitutional question); *see also Anderson v. County of Kern,* 45 F.3d 1310, 1316 (9th Cir.1995) ("administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence."). In the absence of contrary facts and in light of the holding in *LeMaire,* there

9. For this reason the present case is distinguishable from the Ninth Circuit's decisions in *Allen v. Sakai,* 40 F.3d 1001 (9th Cir.1994), and *Spain,* 600 F.2d at 189. In *Allen* the court noted that prison officials should have known that they were required to provide regular outdoor exercise to an inmate whose incarceration in segre-

gation was "indefinite and therefore potentially long-term." *Allen,* 40 F.3d at 1004. In *Spain* the court found that the denial of outdoor exercise was unconstitutional primarily because the inmates had been in segregation for over four years. *Spain,* 600 F.2d at 200.

is no issue as to whether defendants violated plaintiff's clearly established constitutional rights.

■ Relying on *LeMaire*, plaintiff also argues that the denial of outdoor exercise while he was in the DSU was unconstitutional because he did not present a significant threat to security. (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ. J. at 16); *LeMaire*, 12 F.3d at 1458. In *LeMaire* the court noted that denying a segregation inmate outdoor privileges was not unconstitutional partly because the inmate had a history of violent conduct and presented a "grave security risk when outside his cell." *Id.*

■ Although plaintiff in the present case, unlike the plaintiff in *LeMaire*, has not displayed any violent tendencies while in prison, it is noteworthy that plaintiff has never been sanctioned to the DSU under loss of recreation yard privileges for more than one week at a time. Furthermore, each time this sanction was imposed in an effort to discipline plaintiff for his misconduct. (*See* Defendants' Exh. 101 ¶¶ 11–14.) As noted above, federal courts are reluctant to interfere with the operation and discipline of a state prison. *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878; *Holt*, 442 F.2d at 307. In addition, prison regulations should generally be sustained unless they are unreasonable and arbitrary. *Sullivan v. Ford*, 609 F.2d 197, 198 (5th Cir.1980), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980). Based on the record, I find that sanctioning an inmate who refuses to comply with valid prison regulations to one week in the DSU with no outdoor recreation privileges is not unreasonable or arbitrary. Thus, defendants did not violate plaintiff's clearly established constitutional rights.

## B. Medical Care

■ Plaintiff argues that his Eighth Amendment right to adequate medical care was violated when he was allegedly denied certain "prescribed medications" and proper medical treatment for a dry skin problem and a foot problem while in the DSU. (Sec-

ond Amended Complaint ¶ 31.) It is well settled that " 'the government has an obligation to provide medical care for those whom it punishes by incarceration' and cannot be deliberately indifferent to the medical needs of its prisoners." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). However, "[t]he indifference to medical needs must be substantial; a constitutional violation is not established by negligence or 'an inadvertent failure to provide adequate medical care.' " *Anderson*, 45 F.3d at 1316 (quoting *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92).

While in the DSU from March 24, 1994 through March 30, 1994 the only medication prescribed to plaintiff was Keflex which he kept in his cell. (Defendants' Exh. 105 ¶ 12.) Plaintiff was not on any prescription medication when he was in the DSU from April 25, 1994 through April 29, 1994. (*Id.* ¶ 13.) While in the DSU from May 17, 1994 through May 23, 1994, plaintiff was prescribed tinactin cream which he received daily. (*Id.* ¶ 14.) Moreover, it is undisputed that members of EOCI's health services staff saw plaintiff on a daily basis throughout his incarceration in the DSU. (*Id.* ¶ 11; Attach. 1 at 12, 15, 18.) If plaintiff needed more medication or had any other medical needs, he merely had to speak to a health services staff member.

No evidence suggests that plaintiff was unable to receive his prescribed medication or that he was denied the opportunity to receive medical treatment for any condition while in the DSU. In the absence of contrary facts, I find that defendants did not act with deliberate indifference to plaintiff's medical needs.

■ Plaintiff also alleges his Eighth Amendment rights were violated when he was placed on loss of privileges status for seven days in May 1994 and was allegedly unable to go to the canteen to purchase items needed for his "legitimate dry skin problem, for legitimate foot problem, and to prevent dandruff, etc." [10] (Second Amended Com-

---

**10.** On May 2, 1994 plaintiff was prescribed medication to treat a rash on his foot. Plaintiff offers

no evidence to dispute the fact that prison officials provided him enough medication to suc-

plaint ¶ 35.) The record shows that medical officers examined plaintiff on at least two occasions after he complained about his dry skin. The medical officers determined that his condition did not require treatment and recommended that he drink more water. (Defendant's Exh. 105, Attach. 1 at 42, 45.) Because plaintiff's dry skin problem is not a serious medical condition, defendants were not deliberately indifferent to plaintiff's medical needs when he was denied canteen privileges for one week pursuant to his loss of privileges status.

■ Plaintiff further argues that his Eighth Amendment rights are being violated because prison officials will not allow him to leave EOCI to see a doctor for his legitimate medical conditions [11] until he unbraids his hair. However, the source of plaintiff's alleged Eighth Amendment violation is his own noncompliance with a constitutionally legitimate order to unbraid his hair. Therefore, I find that defendants have not acted with deliberate indifference, but rather have diligently attempted to provide plaintiff with adequate medical care despite his refusal to unbraid his hair prior to transport from the facility.[12]

For these reasons, I conclude that defendants have not violated a clearly established constitutional right.

## C. Personal Hygiene Items

■ Plaintiff claims that his Eighth Amendment rights were violated because he was deprived of certain personal hygiene items such as shampoo, conditioner, and body lotion while in the DSU. (Second Amended Complaint ¶ 35; May 31, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. ¶ 8.) The de-

privation of materials necessary for basic personal hygiene may result in an Eighth Amendment violation. *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir.1985); *Ray*, 682 F.2d at 1246–47.

However, there is no evidence suggesting that plaintiff was denied basic personal hygiene items. On the contrary, it is undisputed that "[w]hen an inmate arrives in Segregation, he is provided personal hygiene items consisting of a towel, bar of handsoap, comb, and a toothbrush. Baking soda and toilet paper are issued following meals." (Defendants' Exh. 101 ¶ 23.) Therefore, I find that plaintiff's personal hygiene needs were satisfied. Accordingly, defendants have not violated plaintiff's clearly established constitutional rights.

## D. Food

■ Plaintiff argues that the food at EOCI is "synthetic and nutritionally poor, has an overabundance [sic] of toxic, poisonous chemicals that destroy and deteriorate the human body." (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 22.) The Eighth Amendment requires that prisons provide adequate food to maintain inmates' health. *LeMaire*, 12 F.3d at 1456. The food, however, "need not be tasty or aesthetically pleasing." *Id.*

In his affidavit, plaintiff provides the court with a long and colorful description of the alleged health hazards of the types of food served at EOCI.[13] (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 26.) He fails, however, to set forth any specific facts establishing that the food provided at EOCI is inadequate to maintain inmates'

cessfully treat his condition. (Defendants' Exh. 105, Attach. 1 at 41.)

11. This primarily includes follow-up treatment for a vocal cord tumor which was removed in April 1994. (Defendants' Exh. 105, Attach. 1 at 60.)

12. For example, as noted above, plaintiff was successfully treated for a vocal cord tumor. Plaintiff refused to participate in follow-up treatment for the tumor because doing so would require him to undo his braids as the treatment took place at a local hospital. Prison officials fully informed plaintiff of the possible serious

medical consequences of his refusal to participate in follow-up treatment. They also tried to dissuade him from refusing treatment. (*Id.* at 40.)

13. Plaintiff's affidavit consists merely of generalized allegations that food items such as milk, cheese, pork, and chicken are processed in such way that makes them lethal to consumers. (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summary Judgment at 23–26.) He makes no specific allegations regarding the food served at EOCI.

health. Furthermore, there is no evidence in the record that prison officials have acted with deliberate indifference to plaintiff's health and dietary needs. *LeMaire*, 12 F.3d at 1456. Accordingly, there is no issue as to whether defendants violated a clearly established constitutional right. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 ("a party opposing a properly supported motion for summary judgment 'must set forth *specific facts* showing that there is a genuine issue for trial.'" (quoting Fed.R.Civ.P. 56(e) (emphasis added)).

### E. Drinking Water

 Plaintiff claims the drinking water at EOCI is unsafe because it has "active viruses, bacteria and chemicals that cause kidney stones, arteriosclerosis, emphysema, constipation ... and inflamed gastro-intestinal tracts." (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 25.) However, the record does not support this claim. Other than conclusory allegations, plaintiff fails to offer specific facts showing that the water at EOCI has had detrimental health effects on the inmate population. Therefore, no evidence suggests that prison officials acted with deliberate indifference to plaintiff's water needs. *LeMaire*, 12 F.3d at 1456. For this reason, I find that defendants did not violate a clearly established constitutional right. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").

### F. Sanitation

 Plaintiff also alleges that sanitary conditions at EOCI are inadequate. (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 26–27.) Failure of prison officials to provide adequate sanitation in a prison may result in a violation of the Eighth Amendment. *Anderson*, 45 F.3d at 1314; *Ray*, 682 F.2d at 1246.

In the present case, however, plaintiff offers no evidence suggesting that sanitation at EOCI is inadequate. Rather, he merely states that inadequate sanitation is a violation of the Eighth Amendment. (May 12, 1995 Aff. in Opp. to Defendants' Mot. for Summ.J. at 26.) In the absence of facts to support his claim, summary judgment is appropriate. *See Taylor*, 880 F.2d at 1045.

### G. Confinement to Cell

 Plaintiff argues that his Eighth Amendment right against cruel and unusual punishment was violated on May 16, 1994, when defendants confined him to his cell for less than twenty-four hours to undo his braids in preparation for his transport from EOCI the next day.[14] (Second Amended Complaint ¶¶ 22, 23.) Specifically, he complains about the resulting loss of telephone, television, and day room privileges.[15] (*Id.* ¶ 23.) He also alleges that the confinement in itself amounted to cruel and unusual punishment. (*Id.*)

However, plaintiff fails to cite any cases clearly establishing an Eighth Amendment right not to be briefly deprived of television, telephone, or day room privileges. Rather, case law suggests that it is not a violation of the Eighth Amendment to deprive prisoners of these privileges. *See, e.g., Ray*, 682 F.2d at 1246; *Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir.1982) (prisoners in maximum security have no right to unlimited telephone use). In addition, confining plaintiff to his cell for less than twenty-four hours in an effort to encourage his compliance with valid grooming regulations simply does not approach the ambit of the Eighth Amendment. *See Jordan v. Jones*, 625 F.2d 750 (6th Cir.1980) (holding that confining a prisoner to his own cell for three days does not present a federal constitutional issue); *Anderson*, 45 F.3d at 1045. In short, given the extremely brief period of plaintiff's confinement to his cell and the lack of a clearly established constitutional right to telephone, television, or day

---

14. Plaintiff was allowed to leave his cell for meals and call-outs. (Defendants' Exh. 101, Attach. 5 at 7.)

15. Plaintiff does not claim he needed to call his attorney or that he had one to call. His claim therefore is not one for denial of the right of access to court.

room privileges, defendants' conduct was not sufficiently harmful to establish a constitutional violation. *LeMaire,* 12 F.3d at 1451.

## IV. Due Process

Plaintiff claims the May 16 confinement violated his due process rights because he was denied a hearing prior to being confined to his cell and deprived of exercise, telephone, television, and day room privileges. (Second Amended Complaint ¶ 23.) A liberty interest may arise from the Due Process Clause of the U.S. Constitution or be created by state law. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). With regard to inmates, state created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2295, 132 L.Ed.2d 418 (1995) (citations omitted) (emphasis added).

In the present case, there is no evidence that plaintiff's confinement to his cell for less than twenty-four hours resulted in an atypical, significant hardship. Rather, I find that plaintiff's brief confinement to his own cell clearly falls within the expected parameters of his prison sentence. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301; *see also Anderson,* 45 F.3d at 1316 (holding that confinement to a cell for twenty-three hours a day is within the terms of confinement ordinarily contemplated by a sentence). Thus, because plaintiff's confinement "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest," *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301, defendants were not obligated under the Due Process Clause to hold a hearing. Accordingly, I conclude that defendants did not violate a clearly established constitutional right.

## V. Fourteenth Amendment—Medical Classification

Plaintiff argues that his Fourteenth Amendment due process rights were violated because he has the right "to avoid being classified and treated as mentally ell [sic]" and committed to a mental hospital. (Second Amended Complaint ¶ 21.) Defendants, however, have neither classified plaintiff as mentally ill nor have they made any attempt to transfer him to a mental institution. (Defendants' Exh. 105 ¶ 10.) Plaintiff fails to offer any evidence to the contrary. Thus, defendants have not violated plaintiff's clearly established rights. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Taylor,* 880 F.2d at 1045.

## VI. Discrimination

Plaintiff alleges that defendants have discriminated against him because he is black. Specifically, he contends that on one occasion when he was in the prison infirmary he was not given lotion for his dry skin problem while a white inmate was given vaseline for his chapped lips. (Second Amended Complaint at 10.) Though prison authorities may not discriminate against inmates on the basis of their race, *Tilden v. Pate,* 390 F.2d 614, 616 (7th Cir.1968); *see also Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) ("racial segregation ... is unconstitutional within prisons save for the necessities of prison security and discipline" (internal quotations omitted)), plaintiff offers no evidence that he has been mistreated by prison officials because he is black. Rather, the record shows that health services staff did not administer lotion because plaintiff's dry skin was not medically serious. (Defendants' Exh. 105 ¶ 16.) Moreover, plaintiff has not been denied the opportunity to purchase lotion from the prison canteen even when he was on loss of privileges status. (Defendants' Exh. 101 ¶ 31; Attach. 12.) In short, no facts support a claim of racial discrimination on the part of defendants. Accordingly, I find that defendants did not violate plaintiff's clearly established constitutional rights. *See Taylor,* 880 F.2d at 1045.

## CONCLUSION

Based on the foregoing discussion, I find that defendants have qualified immunity.

Accordingly, it is ordered that defendants' motion for summary judgment (# 44) is GRANTED. It is further ordered that plaintiff's second amended complaint is DISMISSED.