**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES ALLEN HYDRICK; DAVID
LANPHERE; SHAUNDALE GRIFFIN;
FRANK CISNEROS; PAUL PEDERSON;
STEVEN ROBERT CERNIGLIA; GARY
PRICE; DANIEL MROWICI; KENNETH
CIANCIO; MICHAEL MCCLURE; JAMES
MATA; RICHARD BISHOP; MELVIN
FIELDS; RON LEE; LEONARD PIERRE;
THOMAS PRICE; JIMMY GUTHRIE;
BRIAN KELLY; WOODROW JONES;
VASHON JACKSON; BRUCE RILEY;
FRED SCOTT; DEAN DANFORTH;
SAMMY PAGE; JAMES PETERS;
GRAYLING MITCHELL; CARLOS
SAUCEDO; ANTHONY DACAYONA;
CHARLES SALAS, et al.,
              *Plaintiffs-Appellees,*

        v.

MELVIN E. HUNTER, aka/Jon
DeMorales; CRAIG NELSON;
GRENDA ERNST,
              *Defendants-Appellants,*

        and

No. 03-56712

D.C. No.
CV-98-07167-TJH

ORDER AND
OPINION

ROBERT MCDANIEL; JERRY
REYNOLDS; ROBERT PENATE;
SAMUEL ROBINSON; MARK
MAHHONEY; STEPHEN MAYBERG;
ANITA JUDD; MICHAEL HUGHES; JIM
VESS; JACK TOWNSEND; MARK
PALMER; ROCKY SPURGEON; ARNIE
GOBBELL; JIM WILEY; MARK
KALIONZES; ELAINE SHERRILL; GLAN
MIKEL; JAN MAIRE ALARCON;
BARUCH MARGALIT; WILLIAM
KNOWLTON; DIANE IMRAM; CARMEL
MULLER; DALE ARNOLD; GABRIELLA
PALADINO; JEAN DANSEREAU et al.;
WILLIAM CHARLES THIEL; ROBERT
DOUGLAS LEFORT; ARNOLD
SCHWARZENEGGER, Governor of
California,
                              *Defendants.*

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Chief District Judge, Presiding

Argued and Submitted
April 5, 2005—Pasadena, California

Filed August 30, 2007

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson
and Stephen S. Trott, Circuit Judges.

Opinion by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Trott

## COUNSEL

Randall R. Murphy, Deputy Attorney General, Los Angeles, California, for the defendants-appellants.

Kathryn M. Davis, Latham & Watkins, Los Angeles, California, for the plaintiffs-appellees.

## ORDER

The opinion in this case published at 466 F.3d 676 (9th Cir. 2006), is withdrawn and replaced by the new opinion and dissent filed concurrently with this order.

Chief Judge Schroeder and Judge Pregerson voted to deny appellant's petition for panel rehearing and for rehearing en banc. Judge Trott voted to grant the petition for panel rehearing and recommended granting the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested en banc rehearing. *See* Fed. R. App. P. 35(b). The petitions for panel rehearing and for rehearing en banc are DENIED.

No further petitions for rehearing will be entertained.

## OPINION

PREGERSON, Circuit Judge:

Plaintiffs-Appellees represent a class of approximately six hundred civilly committed persons and those awaiting commitment at Atascadero State Hospital pursuant to California's Sexually Violent Predators Act ("SVP Act"). Plaintiffs allege that the conditions of their confinement violate their constitutional rights. They request declaratory and injunctive relief, as well as monetary damages. Defendants filed a motion to dismiss based largely on qualified immunity. The district court denied the motion, which the Defendants now appeal. We have jurisdiction under 28 U.S.C. § 1291; we affirm in part and reverse in part.

## FACTUAL BACKGROUND

### A.    California's Sexually Violent Predators Scheme

The SVP Act defines an SVP as a person "convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others" i.e., is "likely [to] engage in sexually violent criminal behavior." Cal. Welf. & Inst. Code § 6600(a).[1] The Department of Corrections and the Department of Mental Health evaluate convicts who committed predicate offenses at least six months before those convicts complete their sentences. *See id.* § 6601. If those two departments agree that the convict might qualify as an SVP, the district attorney (or counsel for the county in which the evaluated person was convicted) may file a petition for commitment. *See id.* § 6601(i). If a jury finds someone to be an SVP, that person is civilly committed for an indefinite period to commence *after* his criminal sentence is fulfilled. *Id.* §§ 6602-6604.

Once civilly committed, SVPs undergo a five-phase treatment program. Phase One consists of group sessions that educate the SVP about California's SVP Act. During Phase One, the SVP must attend and participate in the treatment sessions. If he does not, his access level[2] is reduced and he is not allowed to advance to Phase Two of the treatment program. In addition, an SVP's failure to attend or participate in treatment sessions is used against him at future probable cause and

---

[1] Although the SVP Act is gender-neutral, there was only one female SVP at the time of the filing of this complaint. She was not housed at Atascadero, and was, therefore, not part of the Plaintiffs' class.

[2] Atascadero assigns everyone an access level that establishes access to various facilities and privileges. A Level 1 patient may not leave his unit without an escort. A Level 2 patient may leave his unit but cannot go to the courtyard or canteen. A Level 3 patient may have some access to the law library, canteen, courtyard, etc.

confinement hearings. The SVP cannot advance beyond Phase One unless he signs a statement in which he acknowledges that he has an "illness" that requires "treatment." Plaintiffs allege that the signed statements are often used against them as admissions of illness in future probable cause and confinement hearings.

Phases Two through Five of the treatment plan involve "cognitive" treatment. This treatment includes viewing videos that depict violent or other inappropriate sexual activities while a repugnant odor or other unpleasant sensation is applied to elicit a negative association.

Each year, an SVP has a right to a "show cause hearing" to determine whether his commitment should be continued. *Id.* § 6605(a)-(b). If it is found that the SVP continues to be a danger to the health or safety of the community, the person is committed for two years from the date of the finding. *Id.* § 6605(e). Successive periods of commitment can be continued indefinitely, or until the SVP completes all five phases of treatment. Upon successful completion of Phase Five, the SVP is conditionally released under the supervision of the California Mental Health Department. According to the Plaintiffs, "only a handful of SVPs have been allowed into Phase Four and no SVP has progressed to Phase Five or ha[s] been found to be ready for release under the treatment protocol."[3]

## B. The Current Lawsuit

On September 2, 1998, the Plaintiffs filed a pro se class action, under 42 U.S.C. § 1983, against Defendants-Appellants Stephen Mayberg (Director of the California Department of Mental Health), Cal A. Terhune (Director of the California Department of Corrections), Jon DeMorales

---

[3]At oral argument it was alleged that, since the Plaintiffs filed their complaint, three (of over seven hundred) people committed under the Sexually Violent Predators Act have been released.

(former Executive Director at Atascadero State Hospital), Grenda Ernst (Clinical Administrator at Atascadero State Hospital), and Craig Nelson (Senior Psychologist Specialist at Atascadero State Hospital). The Plaintiffs sought injunctive and declaratory relief, as well as monetary damages, on the grounds that the policies and procedures governing their confinement and treatment at Atascadero State Hospital violate their constitutional rights.

In March 1999, the district court appointed pro bono counsel for the Plaintiffs. Counsel filed an amended complaint approximately five months later. The Defendants filed a motion to dismiss. The motion to dismiss raised Eleventh Amendment and qualified immunity defenses. The district court denied the motion.

The Plaintiffs filed a second amended complaint on August 14, 2002.[4] Both the first and second amended complaints alleged that the Defendants violated the Plaintiffs' rights by, inter alia: (1) force-medicating the Plaintiffs in non-emergency situations; (2) reducing the Plaintiffs' access levels and other privileges as a form of punishment for refusing to participate in treatment sessions or as retaliation for filing lawsuits; (3) putting the Plaintiffs in restraints for nonthreatening and/or nondisruptive conduct, including the refusal to participate in treatment or therapy; (4) subjecting the Plaintiffs to public strip-searches (sometimes while in four-point restraints); (5) failing to protect the Plaintiffs from abuse by other patients or by Atascadero employees; (6) failing to provide the Plaintiffs with constitutionally satisfactory conditions of confinement; (7) forcing the Plaintiffs to participate in treatment; and (8) denying the Plaintiffs adequate treatment, thereby converting the Plaintiffs' civil confinement to a de facto extension of their prison sentence.

---

[4]The second amended complaint substituted Melvin Hunter, the current Executive Director at Atascadero State Hospital, for Jon DeMorales, the former Executive Director, but contained no substantive alterations.

The Defendants moved to dismiss the second amended complaint, on the same grounds presented in their first motion to dismiss. The district court again denied the motion. The Defendants timely appealed. The Defendants contend that the district court erred by failing to rule that the Eleventh Amendment, state abstention doctrine, or qualified immunity barr the Plaintiffs' suit.

## ANALYSIS

### A.   Standard of Review

We review de novo the district court's denial of a motion to dismiss. *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). Immunity under the Eleventh Amendment presents a question of law, which we review de novo. *See Demshki v. Monteith*, 255 F.3d 986, 988 (9th Cir. 2001). To determine if the Defendants are entitled to qualified immunity, we review de novo whether governing law was clearly established at the time of the alleged violation and whether the specific facts alleged constitute a violation of established law. *See Mabe v. San Bernardino County Dept. of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001).

Although a district court's denial of a motion under Federal Rule of Civil Procedure 12(b)(6) is not ordinarily appealable, the denial of a claim for immunity is appealable before final judgment under the collateral order doctrine and is reviewed de novo. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). All allegations of material fact are accepted as true and should be construed in the light most favorable to Plaintiffs. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). A "complaint should not be dismissed [under Rule 12(b)(6)] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

We note, again, the special difficulty of deciding the motion to dismiss a Defendant on qualified immunity grounds at this stage. Under the notice pleading standard of the Federal Rules, plaintiffs are only required to give a "short and plain statement" of their claims. Fed. R. Civ. P. 8(a)(2). Thus, when reviewing the sufficiency of a complaint before receiving any evidence, our task is a limited one. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

As we recognized in *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding "far-reaching constitutional questions on a non-existent factual record." *Id.* at 957. While "government officials have the right . . . to raise . . . qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case." *Id.* We find that applicable here. The policy justifying qualified immunity motions at this stage is to protect officers against the burden of discovery and pre-trial motions. *See Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). In this case, it appears that discovery was almost complete. The Defendants could have presented this as a motion for summary judgment, and we would have a more developed factual record to guide our decision. However, because the Defendants' motion is framed as a motion to dismiss, we must evaluate the merits of the Defendants' qualified immunity defense before we know the full extent of the alleged abuses at Atascadero, or the reason behind Atascadero policy, or the level of involvement the Defendants had in creating the conditions at Atascadero. As we decide the Defendants' motion, however, we are cautious not to eviscerate the notice pleading standard in suits where qualified immunity is at issue. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002).[5]

---

[5]With respect to our dissenting colleague, the Plaintiffs' complaint states more than "violations of extremely abstract rights." *See* Dissent at

## B. The Law of the Case Doctrine

The Plaintiffs argue that under the law of the case doctrine, we should not reach the merits of the Defendants' appeal because the Defendants' second motion to dismiss was barred by the district court's denial of the Defendants' first motion to dismiss. The relevant facts are as follows: after the Plaintiffs filed their first amended complaint, the Defendants moved to dismiss for failure to state a claim and based on qualified immunity. The district court denied the motion, and the Defendants did not appeal. The Plaintiffs filed a second amended complaint, in which they changed only the name of one of the Defendants. The Defendants then moved to dismiss on grounds substantially similar to those in the previous motion. The district court again denied the motion. The Plaintiffs argue that the Defendants' second motion to dismiss is an impermissible "second bite at the apple" and should be dismissed under the law of the case doctrine.

[1] "Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (citations omitted). For the law of the case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.' " *United*

---

10956 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). The Plaintiffs might be able to provide evidentiary support for their claims. Alternately, the Defendants might be able to justify their behavior, or at least convince us that their conduct was not clearly in violation of the Plaintiffs' rights. But the point of the Rule 12(b)(6) motion is not to evaluate the veracity of the Plaintiffs' allegations, or to speculate as to the Defendants' justifications for their actions. Rather, unless it is "beyond doubt" that a plaintiff cannot prove facts that would entitle him to relief, a Rule 12(b)(6) motion must be denied. *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). The standard is no different for a civil rights claim than for any other claim. *See Galbraith*, 307 F.3d at 1125-26.

*States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000) (quoting *Liberty Mut. Ins. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982)); *United States v. Cote*, 51 F.3d 178 (9th Cir. 1995) ("[T]he law of the case acts as a bar only when the issue in question was actually considered and decided by the first court.").

**[2]** The district court denied both of Defendants' motions to dismiss in one-line orders. Thus, we do not know the district court's grounds for denying the motions. Nor can we say that the district court decided any issue by implication in the first order. The district court could have denied either motion for any number of procedural or technical reasons unrelated to the substance of the motions. It is possible that the district court denied the Defendants' second motion based on the law of the case doctrine, but, it is also possible that the district court decided, in its discretion, not to apply the law of the case doctrine due to subsequent changes in the law, or that the "manifest injustice" that would result given the new party to the suit. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Because we cannot determine the bases for the district court's denial of the motions, the "law of the case" does not apply. Therefore, we address the appeal on the merits.

## C. Eleventh Amendment Immunity and the Abstention Doctrine

**[3]** The Defendants concede that suits for injunctive or declaratory relief do not violate the Eleventh Amendment under *Ex parte Young*, 209 U.S. 123 (1908). The Defendants contend, instead, that the Eleventh Amendment bars the Plaintiffs' request for monetary damages. The Plaintiffs cannot seek monetary damages against state officials in their *official* capacity. *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997). But, the Eleventh Amendment does not bar damage suits against state officials in their *per-*

*sonal* capacity. *Hafer v. Melo*, 502 U.S. 21, 30 (1991); *Ashker v. Cal. Dep't of Corr.*, 112 F.3d 392, 394-95 (9th Cir. 1997).

[4] The Plaintiffs allege the Defendants acted in individual and official capacities, and therefore, the Plaintiffs are suing them in both their individual and official capacities. Thus we presume the Plaintiffs are seeking monetary damages against the Defendants in their personal capacity. *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) (stating a strong presumption in favor of a personal capacity suit where an official capacity suit for damages would be barred). Accordingly, the Eleventh Amendment does not bar the Plaintiffs' claim for damages against the Defendants in so far as they are being sued in their individual capacities.

[5] The Defendants also argue that they are immune because the Plaintiffs are attempting to enforce pendent state law claims in federal court. The Plaintiffs refer, in their first, second, and tenth claims for relief, to provisions in the California Constitution that parallel applicable provisions in the United States Constitution. The Plaintiffs concede that they could not prevail on a § 1983 claim based on a violation of state law, because § 1983, by its own terms, protects only against violations of federal law. *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981). Instead, the Plaintiffs cite California law only where it is legitimate to do so, e.g., where there is a state-created liberty or property interest at stake. *See, e.g*, *Paul v. Davis*, 424 U.S. 693, 710-12 (1976). Accordingly, the Plaintiffs' claims are not barred on this ground, and we need not consider the Defendants' arguments that the Plaintiffs' state law claims are "novel and complex" under 28 U.S.C. § 1367(c).[6]

---

[6]The Defendants also suggest we should "abstain" under the Abstention Doctrine. The Defendants appear to confuse abstention with denial of pendent jurisdiction under the "novel and complex" clause of 28 U.S.C. § 1367(c). If they meant abstention proper, they waived that argument by failing to raise it before the district court. *See Conn. Gen. Life Ins. v. New*

## D.  Section 1983 Claims

**[6]** The Defendants' first substantive argument is that the Plaintiffs have not properly pled a claim under § 1983, because they are not proper defendants for a § 1983 suit. "To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right." *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).

All the Defendants were acting under the color of California law when they engaged in the alleged unconstitutional conduct. The Defendants argue, however, that their conduct did not deprive the Plaintiffs of constitutional or statutory rights.

A person deprives another of a constitutional right, where that person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Indeed, the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44.

In limited circumstances, a person can also be subject to § 1983 liability for the acts of others. Although there is no

_____

*Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Nor do we see any reason to abstain in this situation. *Pullman* abstention is not appropriate because the driving force behind each of the Plaintiffs' claims is a right guaranteed by the United States Constitution, and state court clarification of state law would not make a federal court ruling unnecessary. *See R.R. Comm. v. Pullman Co.*, 312 U.S. 496, 499-501 (1941).

pure *respondeat superior* liability under § 1983, a supervisor is liable for the constitutional violations of subordinates "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

**[7]** The Plaintiffs proceed on two theories: (a) that the Defendants created policies and procedures that violated the Plaintiffs' constitutional rights; and (b) that the Defendants were willfully blind to constitutional violations committed by their subordinates. Because the Defendants were directors and policy-makers for Atascadero State Hospital, the Plaintiffs have sufficiently alleged that the constitutional violations they suffered were "set in motion" by the Defendants' policy decisions or, at the very least, that the Defendants knew of these abuses and demonstrated a deliberate indifference to the Plaintiffs' plight.

**[8]** Under *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988), the Plaintiffs will need to show how the deliberate indifference or affirmative actions of each Defendant caused a constitutional violation before they can seek monetary damages against any individual Defendant. At this stage of pleading, however, the Plaintiffs' need not specifically delineate how each Defendant contributed to the violation of their constitutional rights. Indeed, we do not see how, prior to discovery, they *could* plead the individual roles of each state officer with any more specificity. Taking the statements in the complaint in the light most favorable to the Plaintiffs, the Plaintiffs may be able to state a claim against all of the named Defendants, each of whom played an instrumental role in policymaking and enforcement at Atascadero State Hospital. Therefore, we hold the Plaintiffs have sufficiently alleged the Defendants' role in the alleged constitutional violations against SVPs to survive this motion to dismiss.

## E.   Qualified Immunity

The Defendants also argued that the district court erred when it denied them qualified immunity. As the Defendants

have conceded, qualified immunity is only an immunity from a suit for damages, and does not provide immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993). The Defendants argue that they are entitled to qualified immunity to the extent that the Plaintiffs seek monetary damages.

In analyzing the Defendants' qualified immunity defense, we must determine: (1) what right has been violated; (2) whether that right was so "clearly established" at the time of the incident that a reasonable official would have been aware that the conduct violated constitutional bounds; and (3) whether a reasonable public official could have believed that the alleged conduct was lawful. *See Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir. 1996).

**[9]** To withstand the Defendants' claims of qualified immunity, the Plaintiffs must allege a violation of a right that was clearly established in 1998 — the time the alleged constitutional violations first occurred. *See Anderson*, 483 U.S. at 639-40; *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). To defeat qualified immunity, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

But, the Plaintiffs need not establish that the Defendants' "behavior had been previously declared unconstitutional." *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997). Rather, if binding authority indicates that "the disputed right existed, even if no case had specifically so declared," the Defendants would be on notice of the right. *Id.* at 255. If the occasion has not risen for our circuit to reach a question, we may draw clearly established law from other circuits. *See Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005); *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (finding a violation of clearly established law where there is "such a

clear trend in the case law" that recognition of the right is "only a matter of time").

Before we consider the Plaintiffs' claims individually to determine whether the claims were clearly established in 1998, we address a threshold question that applies to the Plaintiffs' claims more generally. The Defendants argue, as a broad proposition, that damages are not appropriate in this suit because the law applicable to SVPs is still evolving. This suit is unique, in that it is one of the first widespread class actions to challenge the conditions of detention for civilly confined SVPs. However, the Defendants may have transgressed some clearly established boundaries.

[10] First, civilly detained persons must be afforded "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see also Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000). It follows logically, then, that the rights afforded prisoners set a floor for those that must be afforded SVPs, and that where the Defendants violate a standard that is clearly established in the prison context, the violation is clearly established under the SVP scheme, except where the California SVP statutory scheme would give a reasonable official reason to believe that the body of law applicable to prisoners would not apply.[7]

[11] Second, where there is clearly established body of law that applies to all civilly committed persons, there is no rea-

---

[7]Contrary to our dissenting colleague's analysis, we see this as a very minor analytical step. The State detains prisoners for the purpose of punishment. It detains SVPs for the purpose of treatment, and its treatment has no punitive element to it. It seems entirely unremarkable, then, to say that the State cannot treat SVPs *worse* than prisoners. The "only reasonable conclusion from binding authority" is that the conditions of confinement for SVPs cannot be more harsh than those under which prisoners are detained, except where the statute itself creates a relevant difference. *Blueford*, 108 F.3d at 255.

son that the law should not apply to SVPs as well. For, as we have previously held:

> The state cannot have it both ways. If confinement of a sexually violent predator is civil for the purposes of evaluation under the Ex Post Facto clause, that confinement is civil for the purposes of defining the rights to which the detainee is entitled while confined. Civil status means civil status, with all the . . . rights that accompany it.

*Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004).

Thus, there are two bodies of law from which we might draw "clearly established" law for qualified immunity purposes: first, where the SVPs claim a violation of a right that is clearly established even in the prison context, and second, where the SVPs claim a violation of a right that is clearly established for all civilly detained persons.

We acknowledge at the outset that it is not always clearly established *how much* more expansive the rights of civilly detained persons are than those of criminally detained persons. As discussed below, the rights afforded civilly detained persons are flexible enough to take into account the circumstances of detention. The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility. *See, e.g*, *Youngberg*, 457 U.S. at 319-22. In weighing those interests, it cannot be ignored that, unlike the plaintiff in *Youngberg* who was civilly committed because of mental infirmities, SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others. Therefore, the rights of

SVPs may not necessarily be coexistensive with those of all other civilly detained persons.[8]

With these threshold issues in mind, we review each of the Plaintiffs' claims to determine whether they have sufficiently pled a violation of clearly established rights.

## 1. First and Fourteenth Amendment Rights

The Plaintiffs contend that the Defendants retaliated against them for filing lawsuits regarding conditions at Atascadero State Hospital. Specifically, the Plaintiffs claim that, as a result of preparing this suit and others regarding conditions at Atascadero, they have been subjected to access-level reductions, harassment by Atascadero personnel, and excessive room searches and seizures of property. The Plaintiffs also alleged that they have been denied library access in retaliation of their bringing suit and filing complaints.

[12] The Fourteenth Amendment right to access the courts survives detention. *See Bounds v. Smith*, 430 U.S. 817, 821-22 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."); *Cornett v. Donovan*, 51 F.3d 894, 898 (9th Cir. 1995) (holding that "right of access [to the courts] is guaranteed to people institutionalized in a state mental hospital regardless of whether they

---

[8]We thus agree with our dissenting colleague that context is critical in constitutional claims. Nonetheless, this admission — that it is not clear how much more extensive the rights of SVPs are — does not inexorably lead to the conclusion that there can be no violation of clearly established law. It may not be clear exactly what due process rights are to be afforded SVPs, but surely it is clear that certain actions — forcing SVPs to live in squalid conditions, turning a blind eye to physical attacks against SVPs, and forcing SVPs to take medication as punishment or in retaliation for filing a lawsuit or for refusing to speak during treatment sessions — transgress the boundary. Surely it would not require "law train[ing]" or clairvoyance to recognize that these actions, as alleged by the Plaintiffs, do no comport with due process.

are civilly committed after criminal proceedings or civilly committed on grounds of dangerousness"). Similarly, punishment in retaliation for exercising one's right to access the courts may constitute a First Amendment violation. *See Rizzo v. Dawson*, 778 F.2d 527, 531-32 (9th Cir. 1985).

**[13]** We have held that the prohibition against retaliatory punishment is " 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995). Given the facts alleged,[9] the Plaintiffs may be able to prove they were punished in retaliation for exercising their First and Fourteenth Amendment rights to file grievances about the conditions of their confinement. Accordingly, their claims should not be dismissed at the Rule 12(b)(6) stage.

The Plaintiffs also allege that the Defendants force them to participate in treatment that violates their First Amendment rights. Specifically, the Plaintiffs allege that the Defendants bar SVPs from progressing beyond Phase One and obtaining higher access levels until they sign contracts admitting that they have an illness and need treatment. The decision to sign the contract is the ultimate Catch-22: during re-commitment hearings, the contract is used against those who sign it as an admission of illness, and used against those who do not sign it as a refusal to be amenable to treatment.

The Plaintiffs also allege that SVPs who attend but do not vocally participate in group treatment sessions are found by the Defendants to be "not progressing," Accordingly, these

---

[9]The Plaintiffs' original pro se complaint contains particularly persuasive narratives on this issue. It details how Atascadero personnel responded when they learned of this suit, altering schedules so that the coordinators of this action would not be able to work together, telling the Plaintiffs that their meeting in the library was an "illegal assembly," limiting law library time, scheduling mandatory group sessions during the SVPs' library time, and refusing to give SVPs drafting paper because it was "only for the mental patients to draft appeals."

SVPs do not advance to other phases of the program and their access levels are restricted. The Plaintiffs argue that they have a First Amendment right to refrain from saying that they have an illness and to refuse to participate in treatment, and that the Defendants may not punish them for exercising their rights.

There may be a First Amendment right not to participate in treatment, a right respected by the language of California's SVP Act, if not in its implementation. Specifically, the SVP Act directs:

> Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, *nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program.*

Cal. Welf. & Inst. Code § 6606(b) (emphasis added). While it may be in the Plaintiffs' interest to participate in treatment, and the State may create incentives to encourage such participation, "[t]he right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring). As is the case with prisoners, civilly committed persons retain those First Amendment rights not inherently inconsistent with the circumstances of their detention. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). The above statutory language strongly suggests that refusal to recognize one's "illness" or affirmatively participate in treatment is not inherently inconsistent with the purposes for which SVPs are detained.

Granted, the Plaintiffs are not actually forced to speak, but the stakes for refusing to speak are so high that the Plaintiffs' participation in treatment is essentially compulsory. Indeed,

an SVP who exercised his right not to admit his illness could be detained indefinitely. He would never advance past Phase One of the program and his refusal could be used against him at his re-commitment hearing as a sign that he was not sufficiently "rehabilitated" to re-enter society.

Several inmates who are criminally detained raised analogous arguments, on Fifth Amendment grounds, that programs that force sexual offenders to admit and discuss those offenses violate their rights against self-incrimination. In *McKune v. Lile*, 536 U.S. 24 (2002), the Supreme Court held that a program did not violate an SPV's Fifth Amendment rights where it "did not extend his term of incarceration . . . [or] affect his eligibility for good-time credits or parole," and the only adverse consequence was that he was moved to the less desirable non-treatment area of the prison. *Id.* at 38-39.

But *McKune* explicitly left open the question of whether a greater deprivation of liberty might run afoul of the Constitution by essentially compelling detainees to incriminate themselves. At least one court, reading *McKune*, allowed an inmate to proceed past pre-trial motions on First Amendment grounds where the right to parole was conditioned on participation in treatment. *See Wolfe v. Penn. Dep't of Corr.*, 334 F. Supp. 2d 762, 770-73 (E.D. Pa. 2004). Similarly, in this case, where the stakes for participation in treatment are so high, the deprivations involved in refusing to participate in treatment may rise to the level of compulsion that violates the First Amendment.

[14] The question at this stage, however, is not whether the right exists, but whether such a right is clearly established under the First Amendment. Given the volatility of the law on this point, we cannot say that it is. The challenged programs are facially related to the purposes for which SVPs are detained, and while SVPs may have a right to refuse to participate in such treatment, it is not yet clear the extent to which the State can condition privileges or advancement on partici-

pation in such treatment. As such, these claims may be more appropriately considered for declaratory or injunctive relief.

[15] Thus, we hold that the Plaintiffs' First Amendment claims were based on clearly established law insofar as they challenge retaliation for filing lawsuits. To the extent that the claim relies on a First Amendment right not to participate in treatment sessions, the Defendants have qualified immunity, because the law on this point is not clearly established.

## 2. Fourth Amendment Rights

The Plaintiffs allege that Defendants' policies and practices subject Plaintiffs to unreasonable searches, seizures, and unnecessary use of force. According to the Plaintiffs, they are subjected to public strip searches, retaliatory searches of their possessions, and arbitrary seizures of their personal belongings upon arrival at Atascadero. SVPs are also shackled during transport to Atascadero and during visits with family and friends. When they refuse to participate in treatment, SVPs are subjected to "red light alarms" even when they do not pose any physical risk.[10] Moreover, SVPs are force-medicated as a means of intimidation and punishment, and for the convenience of staff.

Accepting these allegations as true, the Plaintiffs may be able to state a "clearly established" violation of their Fourth Amendment rights, and thus, the claims are not appropriate for dismissal at the Rule 12(b)(6) stage. The watchword of the Fourth Amendment in every context is "reasonableness." As this court held in *Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997), "the Fourth Amendment right to be secure against unreasonable searches and seizures 'extends to incarcerated prisoners.' " *Id.* at 699 (quoting *Michenfelder v. Sumner*, 860

---

[10]As explained in the complaint, a "red light alarm" is when ten to twenty staff members surround and restrain the patient.

F.2d 328, 332 (9th Cir. 1988)). Thus, this protection certainly extends to SVPs.

**[16]** Of course, "the reasonableness of a particular search [or seizure] is determined by reference to the [detention] context." *Michenfelder*, 860 F.2d at 332. There are concerns that mirror those that arise in the prison context: e.g., "the safety and security of guards and others in the facility, order within the facility and the efficiency of the facility's operations." *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001). But even so, qualified immunity does not protect a search or seizure that is arbitrary, retaliatory, or clearly exceeds the legitimate purpose of detention.

**[17]** Under this framework, we cannot dismiss the Plaintiffs' claims. The "reasonableness" of a search or seizures is a fact-intensive inquiry that cannot be determined at this stage. *See, e.g.*, *Thompson,* 111 F.3d 694 (9th Cir. 1997). It is impossible to make such a fact-specific determination when the precise circumstances of the searches or seizures are not before the court and when the Defendants have not yet had a chance to justify the alleged searches or seizures. We cannot say, then, that the Plaintiffs cannot possibly state a "clearly established violation" based on any facts consistent with their pleadings.[11] Therefore, Defendants do not have a right to dismissal under Rule 12(b)(6) based on qualified immunity.

### 3.   Double Jeopardy and Ex Post Facto Clauses

The Plaintiffs allege violations of the Double Jeopardy and Ex Post Facto clauses. While the Plaintiffs concede that these two clauses have punishment as an essential prerequisite and

---

[11]The excessive force claims under the Fourth and Fourteenth Amendment — e.g., forced medication, excessive use of red light alarms, and use of shackles — largely duplicate the Plaintiffs' excessive force claims under the Eighth and Fourteenth Amendments, and their claims for Substantive Due Process. We consider all these claims together below.

that the SVP Act is a civil detention statute, they claim that the SVP Act is punitive *as applied to them*. As such, the Plaintiffs argue that their Double Jeopardy and Ex Post Facto claims are not barred.

[18] In upholding a law similar to California's SVP Act, the Supreme Court held that "[a]n Act, found to be civil, cannot be deemed punitive 'as applied' to a single individual in violation of the Double Jeopardy and Ex Post Facto clauses and provide cause for release." *Seling v. Young*, 531 U.S. 250, 267 (2001). Similarly, the California Supreme Court stressed the civil nature of a sexually violent predator commitment and rejected challenges to California's SVP Act based on the Ex Post Facto and Double Jeopardy Clauses of the federal constitution. *See Hubbart v. Super. Ct.*, 19 Cal. 4th 1138, 1171 (1999). The Plaintiffs' claims based on the Double Jeopardy and Ex Post Facto clauses of the federal constitution are foreclosed.[12]

[19] The Plaintiffs argue that *Seling* does not control because they are not "seeking release" as was the habeas petitioner in *Seling*. This is a distinction without a difference. The court in *Seling* made it abundantly clear that the civil nature of the SVP scheme "cannot be altered based merely on the vagaries in implementation of the authorizing statute." *Id.* at 263. Accordingly, we hold that the civil nature of California's SVP Act is not altered because of the remedy sought and we reverse the district court's order denying Defendants' motion to dismiss the claims related to the Ex Post Facto and Double Jeopardy Clauses.

---

[12]*Seling* did not, however, alter our authority to consider implementation of the SVP Act on the Plaintiffs' other claims. *See Seling*, 531 U.S. at 266 ("This case gives us no occasion to consider how the civil nature of a confinement scheme relates to other constitutional challenges, such as due process, or to consider the extent to which a court may look to actual conditions of confinement and implementation of the statute to determine in the first instance whether a confinement scheme is civil in nature.").

### 4. Eighth and Fourteenth Amendment Claims

[20] The Plaintiffs allege in their complaint that the "restrictive and denigrating conditions" at the Atascadero State Hospital constitute cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment has, as an essential prerequisite, the right to punish. *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199 n.6 ("The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Here, SVPs are detained for the purpose of treatment, and the state's power to punish them expires at the end of their sentence. Accordingly, the Eighth Amendment is not the proper vehicle to challenge the conditions of civil commitment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

[21] The thrust of the Plaintiffs' claim here is that because the conditions of confinement amount to punishment, they should be permitted to argue that this "punishment" is cruel and unusual. Once again, this "punitive as applied" argument is foreclosed by *Seling*. Therefore, we hold that the district court erred when it failed to dismiss the Eighth Amendment claim against the Defendants.

Of course, this is a small victory for the Defendants, because the same claims for inhumane treatment and failure to protect may be raised under the Fourteenth Amendment. The standard applicable to SVPs under the Fourteenth Amendment is at least coextensive with that applicable to prisoners under the Eighth Amendment. *See, e.g.*, *Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1146 (S.D. Cal. 2002) (applying Fourteenth Amendment standards to SVPs because "comparable standards apply to both prisoners' Eighth Amendment cruel and unusual punishment and Fourteenth Amendment substantive due process analyses, with Fourteenth Amendment analysis borrowing from Eighth Amend-

ment standards"); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (applying Eighth Amendment standards to evaluate pretrial detainees' Fourteenth Amendment claims). Moreover, the Eighth Amendment provides too *little* protection for those whom the state cannot punish. *See Jones,* 393 F.3d at 931-34; *Andrews*, 253 F.3d at 1061. Plaintiffs apparently recognize this, because their Eighth Amendment claims largely duplicate those raised under the substantive due process clause of the Fourteenth Amendment. Accordingly, we consider the Plaintiffs' allegations that the Defendants actions violate their due process rights under the Fourteenth Amendment.

## 5.   Fourteenth Amendment Procedural Due Process Claims

The Plaintiffs allege a number of procedural due process violations. They allege that Defendants force them to participate in the five-phase treatment program at Atascadero, and based on their progression through that treatment program, subject them to privilege reductions, access level reductions, and reclassifications, and force them to take medication in non-emergency situations. The Plaintiffs allege that these deprivations occur without adequate notice of, or opportunity to respond to, accusations of alleged sanctionable conduct. The Plaintiffs cite caselaw applicable to prisoners and argue that the procedural protections afforded to prisoners in this context should be afforded them as well.

[22] The Plaintiffs have not adequately pled the loss of clearly established due process rights. The Supreme Court has explained that due process claims by prisoners depend in large part on whether the prisoners have some "justifiable expectation rooted in state law." *Montayne v. Haymes*, 427 U.S. 236, 242 (1976); *see also Washington v. Harper*, 494 U.S. 210, 220 (1990). SVPs differ from prisoners in at least one important respect: an individual who has been designated an SVP has been found, under California law, to have "a diagnosed mental disorder that makes the person a danger to the

health and safety of others." Cal. Welf. & Inst. Code § 6600(a)(1). Once a jury designates someone an SVP, California law *requires* that the SVP be provided "treatment for his or her diagnosed mental disorder." *Id.* § 6606(a). Moreover, the SVP commitment statute gives the Department of Mental Health Services the authority to forcibly medicate an SVP for purposes of treatment. *Id.* § 6606(b).[13]

The five-phase treatment program at Atascadero must be "consistent with current institutional standards for the treatment of sex offenders, and . . . based on a structured treatment protocol developed by the State Department of Mental Health." *Id.* § 6606(c). Its purpose, and the purpose of the attendant changes in privileges, access level, and classification under its protocols, is not punishment, but treatment in preparation for the SVP's eventual release.

[23] Accordingly, the Plaintiffs cannot have an expectation to be free of such treatment under state SVP law. The complained-of actions are, at least facially, part of the treatment plan Atascadero is legally required to provide to persons that the state has deemed mentally ill. Given this relevant difference between SVPs and prisoners, we cannot say that the procedural protections provided to prisoners as they relate to forced medication and forced treatment clearly apply to SVPs.

Moreover, there are numerous procedural safeguards afforded to an individual facing an action for civil commitment. Proceedings to designate a person an SVP are initiated only after a finding by two practicing psychologists or psychiatrists that the individual has a "mental disorder" such that he is likely to re-offend unless he receives "appropriate treatment and custody." *See id.* § 6601(d)-(f). Persons in SVP proceedings have the right to counsel, the right to consult experts, the right to have the state prove their SVP status beyond a reason-

---

[13]The Plaintiffs do not challenge California's SVP Act.

able doubt, and the right to a unanimous jury verdict. *See id.* §§ 6603-04.

In addition, after initial designation, an SVP is given periodic opportunities to challenge his continued need for treatment. *See id.* §§ 6605, 6608. Thus, SVPs are not subjected to Atascadero's treatment program without certain procedural protections, nor are they relegated to indefinite treatment without the ability to seek judicial intervention.

**[24]** The Plaintiffs may have liberty interests akin to those possessed by prisoners in this context, and thus may have the right to further procedural protections within the walls of Atascadero. But such rights are not yet clearly established. Because the Plaintiffs have been designated as mentally ill and in need of treatment, a reasonable state official would have reason to believe that the law applicable to the treatment and medication of prisoners did not apply to SVPs. We therefore hold that Defendants are entitled to qualified immunity in regards to Plaintiffs' procedural due process claims. Accordingly, we reverse the district court's holding as to the Plaintiffs' sixth cause of action.

### 6. Fourteenth Amendment Substantive Due Process Claims

The Plaintiffs contend that the Defendants have violated their substantive due process rights by failing to protect them from the abuse of other detainees and employees. The Plaintiffs' claims can be broken down into three general categories: (a) claims that the Defendants failed to protect the Plaintiffs from the abuses of other persons detained at Atascadero; (b) claims that the Defendants failed to provide constitutionally adequate conditions of detention; and (c) claims that the Defendants use excessive force against them.[14]

---

[14]Here, we consider the Plaintiffs' substantive due process allegations from their Second, Fifth, and Seventh causes of action.

First, the Plaintiffs claim that the Defendants have turned a blind eye to the conduct of other persons detained at Atascadero State Hospital. Specifically, the Plaintiffs allege that they are intentionally exposed to feces, urine, vomit, spit, and blood in Atascadero's courtyards, bathrooms, hallways, dining rooms, and gymnasium, and that other detainees contaminate their food with spit and other unsanitary taint. The Plaintiffs allege that they are subjected to verbal harassment, physical abuse, and sexual assaults by other patients at the Hospital. They contend that they are targeted because they are sex offenders.

The patient population at Atascadero State Hospital comprises males who are civilly and penally committed. The individuals committed at the Hospital are confined under a variety of statutes. *See* Cal. Penal Code § 1026 (covering patients "not guilty by reason of insanity"); Cal. Penal Code § 1370 (covering patients "incompetent to stand trial"); Cal. Penal Code §§ 2962, 2964 (covering "mentally disordered offenders" serving their parole time); Cal. Welf. & Inst. Code § 6316 (covering "mentally disordered sex offenders"); Cal. Penal Code § 2684 (covering mentally ill prisoners transferred to Atascadero State Hospital for psychiatric stabilization). According to the Plaintiffs, their forced integration as openly labeled "sexually violent predators" subjects them to verbal harassment, physical abuse, and sexual assaults from the rest of the Atascadero population.

**[25]** The Plaintiffs' right to be protected and confined in a safe institution are clearly established. *See Youngberg*, 457 U.S. at 319-22 (stating that individuals who are involuntarily civilly committed have constitutionally protected rights under the due process clause to reasonably safe conditions of confinement and freedom from unreasonable bodily restraints). The right is clearly established for civilly committed persons and prisoners alike. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Neely v. Feinstein*, 50 F.3d 1502, 1508 (9th Cir. 1995) (finding "clearly established" that patients have a "con-

stitutional right to be safe in the state institutions to which they are committed"). Assuming the Plaintiffs can prove the allegations in their complaint and the Defendants' blindness to such conditions in Atascadero, qualified immunity would not be appropriate on these claims.

**[26]** Second, the Plaintiffs allege that the conditions of confinement are constitutionally inadequate — that they are forced to live in squalid conditions that are inhumane and pose a serious health risk. The Plaintiffs have a clearly established right not to be exposed to such unsanitary conditions. *See Anderson v. County of Kern*, 45 F.3d 1310, 1314-15 (9th Cir. 1995) (collecting cases in prison context); *Youngberg*, 457 U.S. at 315-16 (establishing a right to "personal security" for involuntarily committed persons).[15] Given the Plaintiffs' allegations, their claims as to the unsanitary and unsafe conditions of confinement cannot be dismissed under Rule 12(b)(6).

**[27]** The Plaintiffs also allege several claims of excessive force, e.g., (a) that "red light alarms" are used when the Plaintiffs refuse to participate in treatment, even when persons pose no threat of physical violence; (b) that shackles are used during transportation and during visits with family and friends; and, more generally, (c) that Plaintiffs are subjected to "excessive punishment . . . [and] excessive use of force and physical restraints." It is well-established that detained persons have a right to be free from excessive force. While excessive force claims by prisoners are reviewed under the Eighth Amendment's malicious and sadistic standard, *Hudson v. McMillian*, 503 U.S. 1 (1992), the more generous Fourteenth Amendment standard applies to those who are civilly confined. As we previously stated:

---

[15]In the prison context, claims of unsanitary conditions are evaluated under the Eighth Amendment. *See Anderson*, 45 F.3d at 1314. Although the Eighth Amendment does not apply here, similar standards may apply to SVPs under the Fourteenth Amendment. *See Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1146 (S.D. Cal. 2002)

If confinement of a sexually violent predator is civil for the purposes of evaluation under the Ex Post Facto clause, that confinement is civil for the purposes of defining the rights to which the detainee is entitled while confined [in a treatment facility]. Civil status means civil status, with all the Fourteenth Amendment rights that accompany it.

*Jones*, 393 F.3d at 933.

The Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, *Bell*, 441 U.S. at 536, within the bounds of professional discretion, *Youngberg*, 457 U.S. at 321-22. Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." *Seling*, 531 U.S. at 265; *see also Jones*, 393 F.3d at 931. While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. *See Andrews*, 253 F.3d at 1061 (applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).[16]

[28] We also reiterate that SVPs must, at a minimum, be afforded the rights afforded prisoners confined in a penal institution. Thus, the Eighth Amendment still provides a floor for the level of protection that SVPs must receive under the Fourteenth Amendment, and because the contours of the

---

[16]While *Jones*, *Neer*, and *Seling* are more recent cases, they do little more than restate the contours of law clearly established in *Youngberg*, a 1982 case, and *Bell*, a 1979 case. *Seling* essentially restates the *Youngberg* test, and *Jones* does little more than connect the line between *Youngberg* and SVPs based on California's argument that the statute should be construed as a civil confinement statute. We believe a reasonable official reading *Youngberg* would have sufficient notice that they would be held to *Youngberg*'s standards of due process.

Eighth Amendment are more defined, Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied. Under the Eighth Amendment, the unnecessary and wanton force standard takes into account such facts as the need for the application of force, the relationship between the need and the amount of force used, the threat perceived by the officer, any effort to temper the severity of the forceful response, and the extent of the injury inflicted, and whether the force was applied for a legitimate purpose. *See Hudson v. McMillian*, 503 U.S.1, 7 (1992). If plaintiffs allege conduct that sinks below protections afforded prisoners under the Eighth Amendment, their claim certainly states a violation of their rights under the Fourteenth Amendment.

**[29]** The Plaintiffs allege that force is used in retaliation for exercising legitimate rights and that the amount of force used is often a gross overreaction to the situation. Such use of force, if proved, is not reasonable and failure to curtail such abuses cannot be said to be within the Defendants' professional discretion. Therefore, we affirm the district court's denial of the motion to dismiss on these grounds.

On each of these three grounds — failure to protect, inadequate conditions of confinement, and excessive force — the Plaintiffs may be able to state a "clearly established" Fourteenth Amendment Substantive Due Process violation, and we cannot, at the Rule 12(b)(6) stage, dismiss these substantive due process claims.

### 7.   Fourteenth Amendment Equal Protection Claims

According to the Plaintiffs, they are being treated more restrictively than other civilly committed patients. They allege that their conditions are more punitive than those under which all other civilly committed persons are held. For one example, they allege that other civilly-committed persons are given priority in hiring for remunerative positions.

**[30]** Even though the Plaintiffs do not constitute a suspect class, heightened scrutiny may be required where fundamental interests are at issue. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972). This court upheld application of a "heightened scrutiny standard" when evaluating an equal protection violation under Washington State's Sexually Violent Predator Statute. *See Young v. Weston*, 176 F.3d 1196, 1201 (9th Cir. 1999), *rev'd on other grounds, Seling*, 531 U.S. 250. While *Young* was decided in 1999, it rested on a firmly established principle in existence at the time of events in question: that heightened scrutiny will be applied where a fundamental liberty interest is at stake. *See Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). The Plaintiffs may be able to claim violations of several clearly established fundamental rights: a liberty interest in freedom from bodily restraint and personal security, *Youngberg*, 457 U.S. at 315-316, and a fundamental right to access the courts, as described below. Accordingly, heightened scrutiny is the standard for equal protection claims implicating these fundamental rights. And the Plaintiffs, in line with their allegations, may be able to show that the differential treatment between themselves and other civilly committed persons violates equal protection because such treatment does not meet heightened scrutiny.

**[31]** At the same time, we cannot say that it is firmly established that *every* condition of an SVP's confinement is subject to heightened scrutiny. In the prison setting, we have made clear that prison officials need latitude in deciding how to run prisons, and we have refused to subject each classification drawn by prison officials to heightened scrutiny. Rather, a prisoner cannot challenge the conditions of his confinement on equal protection grounds unless the discrimination against him is irrational or arbitrary. *See McGinnis v. Royster*, 410 U.S. 263, 276 (1973). That is, in so far as the Plaintiffs' claims rely on classifications not related to fundamental liberty interests, the Defendants will have qualified immunity unless there is no rational basis for the classification.

**[32]** Even under the rational basis standard, we cannot dismiss the Plaintiffs' equal protection claims at this stage. The Plaintiffs' pleadings raise several questionable classifications. For example, it seems arbitrary that SVPs should be treated more harshly than other civilly committed persons in job placement and privileges. Based on the pleadings, the Plaintiffs may be able to prove a violation of clearly established law congruent with the facts alleged. Admittedly, at this stage, the Defendants have not fully developed and presented the rationale for their actions and there may be differences between SVPs and other civilly committed persons that warrant differential treatment. But we leave it to the district court, on a fuller factual record, to consider whether the classifications are irrational and arbitrary.

### 8. Sixth Amendment Right to Counsel and Fourteenth Amendment Right of Access to Courts

The Plaintiffs claim that they cannot privately correspond with counsel, have telephone conversations with counsel, and are otherwise hindered in their ability to prepare for their probable cause and commitment hearings.

**[33]** Plaintiffs have a statutory right to counsel in probable cause proceedings and in commitment hearings. Cal. Welf. & Inst. Code §§ 6602, 6603, 6605(d). To protect the right to counsel, "a [detainee] must be given a reasonable opportunity to employ and consult with counsel; otherwise, the right to be heard by counsel would be of little worth." *Chandler v. Fretag*, 348 U.S. 3, 10 (1954). While the Sixth Amendment, by its express language, protects those in *criminal* proceedings, the Fourteenth Amendment protects all detainees against governmental interference in their right of access to courts. *See Procunier v. Martinez*, 416 U.S. 396, 419-20 (1974) (overruled on other grounds); *Cornett v. Donovan*, 51 F.3d 894, 897 & n.4 (9th Cir. 1995). The right of access to courts has been found to encompass the right to talk in person and on the telephone with counsel in confidential settings, *Procu-*

*nier*, 416 U.S. at 419; *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990), and to use available law library resources, *Keenan v. Hall*, 83 F.3d 1083 (1996), subject to legitimate restrictions related to the purpose and circumstances of detention, *see Turner*, 482 U.S. at 89. Where such rights have been upheld in the prison context, SVPs must be afforded rights at least as broad.

**[34]** Such a fact specific inquiry can hardly be undertaken at this point, when it is not clear what the Defendants have done to impede access to the courts, or why they have done so, or how the Defendants' actions have affected the Plaintiffs' right of access. Nonetheless, the Plaintiffs may be able to state a violation of clearly established law congruent with their allegations, and we affirm the district court's order denying Defendants' Rule 12(b)(6) motion to dismiss as to Plaintiffs' Tenth claim based on access to courts.

### 9. Right to Privacy under the Fourteenth Amendment

**[35]** The Plaintiffs allege that the Defendants' policies do not allow for privacy when showering, sleeping, using the toilets, or participating in therapy sessions. It is clearly established that the Fourteenth Amendment protects a sphere of privacy, and the most "basic subject of privacy . . . the naked body." *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985). While the circumstances of institutional life demand that privacy be limited, it is clearly established that gratuitous invasions of privacy violate the Fourteenth Amendment. *See id*. Again, this calls for a highly factual inquiry where the facts are not fully developed. In *Grummett*, for example, we considered the gender of those prison officials who viewed inmates, the angle and duration of viewing, and the steps the prison had taken to minimize invasions of privacy. *See id.* at 494-95. Such facts are simply not available to us at this stage of proceedings.[17] Nonetheless, the Plaintiffs may be able to

---

[17]Moreover, we note that it is not, as the Defendants hinted in their briefs, the burden of the SVPs to show that there is no compelling justifi-

state a violation of clearly established law congruent with their allegations, and as such we will not dismiss their claim under Rule 12(b)(6).

\*\*\*

In sum, we affirm the district court's decision to deny qualified immunity on the Plaintiffs' first, second, seventh, eighth, ninth, and tenth causes of action to the extent noted above. We reverse in part and hold that the Defendants have qualified immunity from suit on the Plaintiffs' Ex Post Facto, Double Jeopardy, Procedural Due Process, and Eighth Amendment claims.

### F. The Defendants' Belief That Their Conduct Was Lawful Was Not Objectively Reasonable

[36] Even if the Plaintiffs have alleged violations of a clearly established right, a government official is entitled to qualified immunity if he or she "could . . . have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001); *see also Alford v. Haner*, 333 F.3d 972, 977 (9th Cir. 2003). This is a limited exception, however: if the law is clearly established, the immunity defense "ordinarily should fail, since a reasonably competent public official should know the law governing [the official's] conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

[37] Whether the Defendants' conduct was reasonable involves a factual analysis of the circumstances surrounding Defendants' actions and a determination of whether a reason-

---

cation for the regulations, but rather the burden of the State to show that there is such a justification. *See Walker v. Sumner*, 917 F.2d 382, 385-87 (9th Cir. 1990).

able official similarly situated would have been aware that his/her actions violated the law, an inquiry difficult to conduct at this stage. Based on the facts in front of us, however, we do not believe Defendants can claim that their conduct was objectively reasonable. The Defendants argue that the volatile nature of the law surrounding SVPs entitles them to escape liability entirely. We do not adhere to the theory that "every dog is entitled to one bite." The Defendants could not have been so completely unaware of the standards that would apply to their conduct as it related to SVPs. As explained above, SVPs are not entirely dissimilar from other groups of civilly committed persons. Moreover, the Plaintiffs' complaint alleges practices that would be unconstitutional if directed at any prisoner. Accordingly, Defendants cannot escape liability based on a "reasonable but mistaken" belief about the constitutionality of their conduct.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part the district court's order denying the Defendants' second motion to dismiss under Rule 12(b)(6). Each side to bear its own costs.

---

TROTT, Circuit Judge, concurring in part and dissenting in part:

## I

My disagreement with my colleagues is limited to one critical issue. We agree that plaintiffs cannot seek damages in this lawsuit against state officials in their *official* capacities, and that plaintiffs cannot seek damages from the State either. So, what is left where the officials are concerned? A lawsuit against them personally for acts and omissions alleged to have

been taken in the discharge of their official duties. It is here that I part company.

The issues raised by these plaintiffs are certainly important and require our attention, but the issues can be thoroughly litigated and authoritatively decided *without* involving the state officials as individuals. Requiring these individuals to participate in their individual capacities not only is unnecessary, but to render them personally liable for damages contravenes the very purpose of the doctrine of qualified immunity as explained by the Supreme Court:

> [P]ermitting damages suits against government officials can entail substantive social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

*Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Accordingly, the Court has held that officials are immune unless "the law clearly proscribed the actions" they took, *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); and that the unlawfulness must be apparent in the light of preexisting law. *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

On this record, and under these circumstances, I conclude, with all respect to my colleagues, that these officials as individuals are entitled to qualified immunity against both suit and damages — now, not later. In my view, the particulars and the contours of the alleged constitutional rights upon which the plaintiffs rely were not so clearly established at the times under scrutiny and at the level of specificity required such that a reasonable official hired by the state to cope pursuant to statutory authority with lawfully confined sexually violent predators subject to remedial treatment would have been aware that the conduct alleged violated federal constitutional bounds. Given the unsettled nature of the law in this

area, a reasonable official could certainly have believed otherwise.

We decide this appeal with clear analytical guidance from the Supreme Court:

> Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.
>
> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.* Harlow *would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give*

> *rise to liability for damages*." It should not be sur-
> prising, therefore, that our cases establish that *the
> right the official is alleged to have violated must
> have been "clearly established" in a more particu-
> larized, and hence more relevant, sense*: The con-
> tours of the right must be sufficiently clear that a
> reasonable official would understand that what he is
> doing violates that right. This is not to say that an
> official action is protected by qualified immunity
> unless the very action in question has previously
> been held unlawful, *but it is to say that in the light
> of pre-existing law the unlawfulness must be appar-
> ent*.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987) (empha-
sis added) (alteration in original) (internal citations omitted).

As my colleagues acknowledge, "this suit is unique, in that
it is one of the first widespread class actions to challenge the
conditions of detention for civilly confined SVPs." It is not
only unique, but it requires us to answer questions never
before squarely addressed in this context. This factor alone
should be enough to entitle these individual defendants to dis-
missal.

My colleagues rely on *Youngberg v. Romeo*, 457 U.S. 307,
322 (1982) for the proposition that "civilly detained persons
must be afforded 'more considerate treatment and conditions
of confinement than criminals whose conditions of confine-
ment are designed to punish.' " This is an unremarkable quote
used out of context, but it gets us nowhere in pursuit of an
answer to the central question of whether we have *in this law-
suit* violations of clearly established rights. Why? Because
*Youngberg* dealt with the passive confinement for their own
good of mentally defective persons. In contrast, and as
recently recognized by the Supreme Court, sexually violent
predators are confined in order to protect "the public from
dangerous individuals with treatable as well as untreatable

conditions." *Seling v. Young*, 531 U.S. 250, 262 (2001). In addition, the *Seling* Court said that the case before it for decision "gives us no occasion to consider how the civil nature of a confinement scheme relates to other constitutional challenges, such as due process . . . ." *Id.* at 266. It is little wonder, therefore, that my colleagues admit in connection with *Youngberg* that "it is not always clearly established *how much more expansive* the right of civilly detained persons are than those of criminally detained persons." I disagree with my colleagues' claim that "[i]t follows logically [from *Youngberg*], then, that the *rights afforded prisoners* set a floor for those [rights] that must be afforded SVPs, and that where Defendants violate a standard that is clearly established *in the prison context*, the violation is clearly established under the SVP scheme[.]" Certainly this "logic" based assertion is not a proposition clearly established and controlling at the time relevant to this lawsuit. Saying that rights follow logically from one area to another is an admission that those rights have not yet been clearly established in the area to which they are being transported. Prisoners have constitutional rights flowing from certain constitutional guarantees that do *not* apply out of the criminal context. Which clearly established "prisoner rights" are they talking about? I cannot find my colleagues' bold assertion anywhere in any case before this one. Where is the required level of specificity required to hold these *individuals* personally responsible for their acts? It is nowhere to be found. Where is the fair warning to them as to the constitutional limits of their compulsory treatment programs? Expanding and extending some rights from other contexts and extrapolating others defies the salutary purpose of the doctrine of qualified immunity.

My colleagues concede that the defendants are entitled to qualified immunity with respect to the plaintiffs' procedural due process claims under the Fourteenth Amendment. Why? Because these plaintiffs are markedly different than prisoners. The plaintiffs are subject to a program mandated by state law requiring that they be treated for their diagnosed mental disor-

ders, treatment which includes forcible medication and is subject to "numerous procedural safeguards." The critical distinction recognized by my colleagues — in my view — should carry over to *all* claims made by these plaintiffs, not just the claim to which it is selectively applied.

I find more than significant the relative newness of the civil commitment procedure at issue in this case. California's Sexually Violent Predator Act was enacted in 1995. The constitutionality of this concept was not upheld until 1997, *see Kansas v. Hendricks*, 521 U.S. 346 (1997); and California's own courts did not begin definitively to iron out controversial statutory issues of treatment — such as involuntary medication without a separate court order — until 2004. *See In re Calhoun*, 18 Cal. Rptr. 3d 315 (Cal. Ct. App. 2004). When did the acts complained of here occur? 1998, in the midst of grappling by appellate courts with this new modality and two years before *Seling*. In fact, the courts have yet to clarify if and how the Constitution protects sexually violent predators from various confinement and treatment modalities. Context is critical to the determination of whether a constitutional right has been established. The Supreme Court confirmed this principle in *Washington v. Harper*, 494 U.S. 210 (1990), a lawsuit filed by a mentally ill state prisoner complaining against treatment with anti-psychotic drugs against his will and without a judicial hearing. In holding that such treatment did not violate either substantive or procedural due process, the Court said, "The extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement." *Id.* at 222.

We read the same message in *Parham v. J.R.*, 442 U.S. 584, 608 (1979): "What process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made." *See also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

Noteworthy in *Washington v. Harper* was a correct holding by the Washington Supreme Court that the individual defendants were entitled to qualified immunity. 494 U.S. at 218 n.5. The case was allowed to proceed, but *only* to consider claims for injunctive and declaratory relief under § 1983 as well as state law — which is precisely what should happen here. It seems that we are now requiring doctors and other staff to consult not just with lawyers before they devise a procedure or treatment for a sexually violent predator, but with the courts.

The Supreme Court warned against this result in *Parham*, saying, "Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer. Surely, this is the case as to medical decisions, for neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments. . . . The mode and procedure of medical diagnostic procedures is not the business of judges." 442 U.S. at 607-08 (internal citations and quotations omitted).

The penalty for not anticipating a court ruling will be individual liability. This unfortunate situation is precisely what the doctrine of qualified immunity is designed to avoid.

## II

It would appear that my colleagues' approach to this case is at irreconcilable odds with cases from at least four other Circuits, the First, Fourth, Sixth, and Eleventh.

In *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701 (1st Cir. 1993), a panel including Stephen Breyer, now Justice Breyer, observed that claims against government officials for money damages cannot proceed unless predicated upon "clearly established" statutory or constitutional rights of which a reasonable person would have been aware. *Id.* at 704. In affirming a grant of summary judgment against the plain-

tiffs on the ground that the law relied upon by them was not yet settled at the time of the actions in question, the Court observed that "[t]he determination is time-critical." *Id.* In other words, no individual can be held personally liable for violating a law that has not yet become particularized, which means fixed in connection with a precise context. First the clearly established law, then — and only then — potential personal monetary liability for public officials. Due process alone would seem to require such a sequence. As the Sixth Circuit explained in *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996),

> the ultimate burden of proof in this suit is on the plaintiffs, who must establish that Testa's conduct [as a public official] violated a federal right so clearly established that any official in his position would have understood that he was under an affirmative duty to refrain from such conduct.

The court went on to indicate that "individual capacity defendants in § 1983 cases receive some benefit from legal doubt about the clarity of existing law. *Id.* at 1542. The Eleventh Circuit would agree with this proposition, remarking that " '[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.' " *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1550 (11th Cir. 1994)) (alteration in original). Relying on one of our cases, *Lum v. Jensen*, 876 F.2d 1385, 1389 (9th Cir. 1989), the Fourth Circuit remarked that public officials " 'are not required to predict the future course of constitutional law' "; and that "[r]arely will a state official who simply enforces a presumptively valid state statute lose her immunity from suit." *Swanson v. Powers*, 937 F.2d 965, 968, 969 (4th Cir. 1991). The court concluded with this wise statement:

> The ills that would result from allowing suits for damages against state officials who simply perform

their official duties are evident. Suits such as these have the potential to threaten the foundations of our most basic governmental functions-in this case, the collection of the revenue. Because the plaintiffs' asserted rights were not clearly established and because Secretary Powers acted reasonably in enforcing presumptively valid state statutes, we hold that she is entitled to immunity from suit. The judgment of the district court is therefore reversed.

*Id.* at 973.

In so far as my colleagues insist on borrowing principles from other contexts, they part company with the Sixth Circuit, which has held:

We may not impose personal liability upon state social workers because they failed to anticipate that principles of law *developed in other distinct contexts* would be applied to them, for to do so would be contrary to the admonition in *Anderson v. Creighton*, 107 S. Ct. at 3039, that we should not allow plaintiffs to convert "the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*Eugene D. v. Karman*, 889 F.2d 701, 711 (6th Cir. 1989) (emphasis added). *See also Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmonson, J., dissenting) (public officials not obligated to draw analogies from other cases), *rev'd en banc*, 998 F.2d 923, 923 (11th Cir. 1993) (per curiam) (adopting the reasoning of Judge Edmondson's dissent and reversing district court's denial of summary judgment to public official).

## III

I take issue also with my colleagues' assertion that because the facts are not yet developed, it is too early in this lawsuit

to dismiss because of qualified immunity. This claim misses the mark. As held repeatedly by the Supreme Court, qualified immunity is immunity from being sued, not just from damages. This principle explains (1) why the Court warned in *Anderson* against non-specific pleadings that allege violations of "extremely abstract rights," 483 U.S. at 639; and (2) the Court's holding in *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." The Court revisited this issue again in *Behrens v. Pelletier*, 516 U.S. 299 (1996). In the course of overruling a mistaken opinion by the First Circuit, the Court said,

> The source of the First Circuit's confusion was its mistaken conception of the scope of protection afforded by qualified immunity. *Harlow* and *Mitchell* make clear that the defense is meant to give government officials a right, not merely to avoid "standing trial," but also to avoid the burdens of "such *pretrial* matters as discovery . . . , as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' "

*Id.* at 308 (quoting *Mitchell*, 472 U.S. at 526 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982))) (alterations in original). The Court, in reversing us in 1991 on this very issue, said, "[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). *See also Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("[I]f the defendant does plead the immunity defense, the district court should resolve that threshold question before permitting discovery."); *Maraziti v. First Interstate Bank of California*, 953 F.2d 520, 526 (9th Cir. 1992) (discovery should not be allowed until immunity has been decided).

Finally, my colleagues express their intention "not to eviscerate the notice pleading standard" that our system generally uses to commence a lawsuit. I do not believe this caution is well suited to this context. Again, I reiterate that the question of qualified immunity requires prompt resolution. *Anderson* seems to require pleadings more specific than the usual "notice" standard. At the very least, pleadings against state officials in their individual capacities must demonstrate an alleged violation of a particularized and relevant constitutional right which has been clearly established. *Hunter v. Bryant* also would seem to so require. To hold otherwise is to disserve a doctrine that calls for resolution of the issue at the "earliest possible stage" in litigation. *Hunter*, 502 U.S. at 227. As Justice Kennedy said in *Siegert v. Gilley*,

> [t]he heightened pleading standard is a departure from the usual pleading requirements of Federal Rules of Civil Procedure 8 and 9(b), and departs also from the normal standard for summary judgment under Rule 56. But avoidance of disruptive discovery is one of the very purposes for the official immunity doctrine, and it is no answer to say that the plaintiff has not yet had the opportunity to engage in discovery. The substantive defense of immunity controls.

500 U.S. 226, 236 (1991) (Kennedy, J., concurring). *See also Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) ("When a public official pleads the affirmative defense of qualified immunity in his answer, the district court may, on the official's motion or on its own, require the plaintiff to reply to that defense in detail. . . . There is a powerful argument that the substantive right of qualified immunity supplants the Federal Rules's scheme of pleading by short and plain statement."); *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963-64 (9th Cir. 2004).

## IV

The question remains, how specific must the right allegedly violated be defined in order to answer the question whether it was clearly established? *Wilson v. Layne*, 526 U.S. 603 (1999) gives us a good example of the degree of specificity required. In *Wilson*, the Court concluded first that officers who took members of the media into a homeowner's home to observe and to record the execution of an arrest warrant did so in clear violation of the Fourth Amendment. Nevertheless, the Court concluded also that the officials who did so were entitled to qualified immunity. The Court said that the appropriate question "is . . . whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful . . . ." *Wilson*, 526 U.S. at 615. Concluding that at the time of the violation the law was "at best undeveloped," the Court said, "Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.' " *Id.* at 617 (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978)).

From these precedents, I conclude that the proper question in this case is whether it was clearly established at the time of the events in this case that the Constitution prohibited persons in the position of *these* individual officials from engaging in any of the behaviors attributed to them in connection with the management and treatment of sexually violent predators civilly confined under state law for treatment and for the protection of the public. After reviewing all the relevant cases and authorities, I answer this question in the negative.

The analytical error made by my colleagues becomes apparent when they say,

> Thus, there are two bodies of law from which we might draw "clearly established" law for qualified immunity purposes: first, where the SVPs claim a

violation of a right that is clearly established even in the prison context, and second, where the SVPs claim a violation of a right that is clearly established for all civilly detained persons.

What this acknowledges is that we cannot find any clearly established substantive rights in the SVP context, so we have to borrow them from other areas. An approach like this certainly works well when the unanswered question is what constitutional rights might these sexually violent predators have in this system, but it fails utterly when the issue is whether we hold individuals personally liable ex post facto for their actions.

This lawsuit should proceed so that specific answers can be found to the constitutional questions raised by the plaintiffs, but it should proceed only in connection with possible declaratory or injunctive relief. To do otherwise will deter government officials in the future from doing anything not to the liking of a sexually violent predator. The penalty for making a good faith mistake in an area of undeveloped law may be the costs of a lawsuit and the potential personal liability arising out of the official performance of a state job.